**FILED**

Jun 22 2017, 5:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Donald E.C. Leicht | Curtis T. Hill, Jr. |
| Kokomo, Indiana | Attorney General of Indiana |
| | Chandra K. Hein |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Keith D. Abney, | June 22, 2017 |
| *Appellant-Defendant*, | Court of Appeals Case No. 34A02-1608-CR-1746 |
| v. | Appeal from the Howard Superior Court |
| State of Indiana, | The Honorable William C. Menges, Jr. |
| *Appellee-Plaintiff*. | Trial Court Cause No. 34D01-1510-F2-914 |

**Brown, Judge.**

[1] Before us is an important question we have not often had the opportunity to determine: what level of involvement by an attorney in a judge's judicial campaign requires the judge to recuse from presiding over a case in which the attorney is involved? We apply case law, Criminal Rule 12, and the Code of Judicial Conduct to determine that here, recusal is not required.

*Facts and Procedural History*

[2] Between October 1, 2015, and October 3rd or 4th, Kokomo Police Sergeant Mark Miller conducted surveillance on Abney's residence. Sergeant Miller spoke with Kurt Beck, Brian Dullworth, and Jonah Sands regarding activity at the residence. On October 5, 2015, Kokomo Police Officer Adam Martin conducted surveillance on Abney's residence. Officer Martin observed vehicles arrive and leave the residence, and he observed a vehicle arrive at the residence and a white female exit the vehicle, go to the rear of the residence, enter, and exit approximately one or two minutes later. He conducted a traffic stop of her vehicle following an infraction and discovered two females, some syringes, and a bag of heroin in the vehicle. Officer Martin obtained a search warrant for the residence.

[3] On October 6, 2015, at approximately 7:43 p.m., Kokomo Police Officer Zach Rodman, Detective Derek Root, and Officer Charlie Fourkiller assisted Officer Martin in the execution of the search warrant. Police discovered Abney, Patrick Acord, and Joyce Linkenhoker in the residence. They also discovered a gray rock-like substance that field tested positive for heroin in the kitchen, as well as drug paraphernalia that tested positive for methamphetamines, a pill

bottle that contained multiple bags of a substance that field tested positive for heroin, a .380 handgun, a bag of syringes, a plastic bag that contained plant material that later tested positive for marijuana, digital scales, mail containing Abney's name and the address where they were located, a monitor with a live feed of surveillance cameras surveying the outside of the residence, and $1,625.

[4]     Kokomo Police Sergeant Shane Melton read Acord his rights, and Officer Fourkiller read Abney and Linkenhoker their rights. Linkenhoker said that she "had some marijuana in a pipe or a dugout." Transcript at 61. Abney stated that the gun belonged to a girl named Carrie Russell ("Carrie"), that he had given her fifty dollars, and that he was holding the gun as collateral. He also stated that anything Officer Martin finds "is going to be on the kitchen counter or lower level because he's wheelchair bound." *Id.* at 118. When the police discovered narcotics in the house, Abney stated that it was going to weigh about an eight ball, which is about 3.5 grams. Acord told Sergeant Melton that he was selling only his prescription pills and that he was not a heroin dealer.

[5]     In October 2015, the State charged Abney with: Count 1, dealing in a narcotic drug as a level 2 felony; Count 2, possession of a narcotic drug as a level 4 felony; Count 3, possession of methamphetamine as a level 5 felony; Count 4, maintaining a common nuisance as a level 6 felony; and Count 5, unlawful possession of a syringe as a level 6 felony. On June 22, 2016, the State filed amended counts including: Count 1, dealing in a narcotic drug as a level 3 felony; Count 2, possession of a narcotic drug as a level 5 felony; Count 3,

possession of cocaine as a level 5 felony; and Count 4, maintaining a common nuisance as a level 6 felony.

[6] On October 15, 2015, the court held an initial hearing, Abney requested the appointment of a public defender to represent him, and the court did so and scheduled a jury trial for January 15, 2016. A deputy public defender filed an appearance on October 23, 2015, and another deputy public defender filed an appearance on November 24, 2015. On March 11, 2016, the court held a competency hearing and found Abney competent to understand the proceedings and to stand trial. In May 2016, the court scheduled a jury trial for June 3, 2016. Abney filed a motion for a continuance, and the court granted the motion and continued the trial to June 10, 2016, and later rescheduled the trial to June 24, 2016, due to court congestion.

[7] On June 23, 2016, Abney filed a motion to recuse the sitting judge, Judge William C. Menges, Jr., and argued that the elected Prosecuting Attorney Mark McCann is or recently was a member of the campaign committee of the judge and that Judge Menges had an ethical duty to disclose his relationship with Mr. McCann and/or other members of the Howard County Prosecutor's office. Abney requested that the court set the matter for a hearing and upon notice and hearing recuse from the case.

[8] On June 24, 2016, the court conducted *voir dire*, released the jury for the weekend, and held a hearing on Abney's motion to recuse. Abney's counsel stated that he spoke with Abney a couple of weeks earlier, Abney had raised a

concern about whether there was a "conflict between this prosecutor," that on June 23, 2016 he and Abney discussed a newspaper article, and that statements in the article caused him to file the motion to recuse. *Id.* at 7. He also stated: "Based upon *Bloomington vs. Kiang*, I believe that this needs to be disclosed. It's obviously been disclosed publically [sic] now but this relates to a fact that we need to be disclosed and upon the request of the defendant the recusal is awarded." *Id.* at 9. Over the prosecutor's objection, the court admitted Defendant's Exhibit A, a newspaper article dated June 10, 2016, which stated in part:

> Months ahead of the general election, the race for the judge's chair in Howard County Superior Court I grows tumultuous.
>
> Democratic candidate for the position of judge, Erik May, recently called into question the inclusion of county prosecutors on incumbent Judge William Menges' election campaign.
>
> On May 27, May, representing Bradley Morgan, appeared in Superior Court I where he sought to have Menges recuse himself from the case.
>
> Over the course of the hearing, May cited a case known as Bloomington vs. Kiang. He believed the case set a precedent where Menges would be required to identify, on the record, his political ties to Chief Prosecutor Mark McCann, who was at the hearing, and Deputy Prosecutor Mark Hurt, who is prosecuting the case.
>
> Bloomington vs. Kiang involves a case in which a judge was forced to recuse herself from the case because the opposing

council's [sic] attorney was found to have been the chair of the judge's election committee. In an Indiana Court of Appeals opinion on the case, it was found that "the relationship between judge and the opposing counsel is of the type of information that can reasonably be considered relevant to a possible motion for disqualification" and that information wasn't shared with the opposing counsel prior to the case beginning. Because the political tie had not been disclosed prior to the case beginning, the judge's impartiality was called into question.

As such, May believed the precedent required Menges to disclose McCann and Hurt's positions on the judge's committee and recuse himself from cases involving his supporters.

Over the course of the hearing Menges recused himself from the case, but for a reason not involving any political affiliations.

* * * * *

The question remains, however, about the ethics of county prosecutors serving on Menges' reelection committee. According to legal experts, the most important part of the equation is an attorney's involvement in the committee.

"It seems to me, if I'm a lawyer on the other side and this guy signed up for the judge's campaign, I need to know," said Charles Geyh, a legal ethics expert at Indiana University's Maurer School of Law. "Such things as how much assistance did this guy render before he left the campaign, to what extent does that imply a relationship that is close, personally and professionally, that a reasonable person would look at that and say they doubt the judge's impartiality. You would want to look at those facts, look at what that information is, and make an assessment."

McCann said as of now he has yet to participate in any election committee activities on behalf of Menges.

"As I stated in the hearing, I was asked to serve on an advisory committee for Judge Menges," said McCann. "I agreed and that's been some time ago. I've not actively participated in his campaign. I've not discussed anything with him in his campaign and actually I made a courtesy call to Mr. May shortly after I agreed to that, letting him know that. That was about a day after he announced his candidacy."

Hurt's statement was similar, and he said he was asked to have his name listed on a letter of endorsement by Menges. Since the hearing, he decided not to take part in Menges' committee.

"Judge Menges' support letter has not been published," said Hurt in a statement. I was planning to be on the letter since I believe Judge Menges is a good judge who serves our local community well. However, given one probationary license case filed with Judge Menges', and objections raised by his opponent . . . I am not going to be listed on a support letter. Under Indiana law, in the majority of counties in Indiana, trial judges are elected in partisan elections. It is common for lawyers to be listed on the letterhead of the campaign committees of judges who they support."

McCann, on the other hand, said he would continue to support Menges.

"As it stands now, unless someone instructs me otherwise, I will continue to serve on the advisory committee as that entails," said McCann. "I don't believe in any way that interferes with my ability to carry out my duties as prosecutor."

Menges said he doesn't believe *Bloomington vs. Kiang* applies in the matter regarding him and the prosecutors at this point because in that particular case the lawyer had served as the chair of the judge's election committee. Thus far in Menges' campaign, he said he only sought a public endorsement from the prosecutors.

"It's just a public endorsement," said Menges. "It doesn't even come close. The other thing is if it is a problem, then I would simply ask Mark to not be on the committee. They haven't done anything yet. We haven't even at this point, established a committee. Mark was just asked if they would serve. They indicated they would. We don't even have the committee yet, let alone somebody playing an active role in it."

If the prosecutors simply appear on a letterhead or endorse Menges publicly, Geyh said he didn't see such an act as calling the judge's impartiality into question.

"If they are neither running his campaign nor fundraising on his behalf, I'm not all that troubled by a simple statement of support," said Geyh. "Lawyers routinely make modest contributions to the campaigns of judges before whom they appear, and the judge is not required to disqualify later as a consequence of that. A simple statement of support doesn't strike me as that different."

Menges said Bob Hingst serves as the chair of his reelection committee at this point, and Chief public Defender Steven Raquet also serves on Menges' reelection committee.

May said attorneys don't serve on his election committee because he "wouldn't put a colleague in that position."

Defendant's Exhibit A.

[9]     The court stated:

> I would note that within the article the writer, the reporter contacted, in quotes, Charles Geyh, who they identify as a legal ethics expert at Indiana University's Maurer School of Law, who says later on if the prosecutors simply appear on letterhead or on endorsement just publically [sic], Geyh said he didn't see such an act as calling the judge's impartiality into question. Secondly, based on hearsay, I've been informed by Mr. McCann that he consulted Mr. Rumburg who apparently is an advisor of some sort to the Prosecuting Attorney's Council. Mr. Rumburg saw no ethical issue either from my point, my part or from Mr. McCann's part. Thirdly, the allegation raised by Mr. May would have required or at least what he was attempting to do for (inaudible) of political purposes, was to put the court in a position where it could hear no criminal cases pending the outcome of the election that which would obviously or could obviously be exploited as a political advantage by Mr. May, and so I consulted the Judicial Qualifications Commission. The Staff Attorney indicated in no uncertain terms that they do not read the *Bloomington* case the same way that imminent [sic] legal scholar and expert on legal ethics, Dan May, reads it. And saw no problem with me continuing to preside over criminal cases. Finally as to the impartiality argument, we have another very interesting twist as it applies to this particular case because, and I will, or there's two things, Mr. Steele, for the purposes of this hearing. Number one, I will take judicial notice that you are a Deputy Public Defender, that you serve at the pleasure of Steven Raquet, the Chief Public Defender, and his Chief Deputy, Andy Vandenbosch, and I would further take judicial notice of the fact that those two gentlemen are partners of yours in your private practice of law. Both of them have agreed to serve in exactly the same role that Mr. McCann has, as willing to publically [sic] endorse my candidacy. So what we have from a very practical

standpoint is a legal precedent being cited that has no bearing on this case or I shouldn't say no bearing, no application to this case and it is very easily distinguished, and, secondly, as to the argument of impartiality, we have both sides supporting my candidacy or at least the relationship, the higher parties, if you will, from both sides are supporting my candidacy, so I don't think any impartiality can be impugned from that fact. We'll show the Motion to Recuse denied.

Transcript at 12-13.

[10] On June 27 and 28, 2016, the court held a jury trial. The State presented the testimony of Officer Rodman, Detective Root, Sergeant Melton, Officer Martin, and others. During direct examination, the prosecutor asked Sergeant Melton if Acord accepted responsibility for anything, and he answered:

He told me, I talked to him outside in the front of the house after I read him his rights, you know, 'cause initially when we show up everybody's always, what's going on, why are the police here, you know, the same old thing, but he stated that he was only selling his prescription pills and that he wasn't a heroin dealer. He sold, I think they were Oxycodones. They were the blue pills, and so he wanted to take ownership of selling his own prescription because he needed the money, but he didn't say anything about selling heroin.

*Id.* at 63. On cross-examination, Sergeant Melton testified that Acord admitted to using heroin.

[11] During the cross-examination of Officer Martin, Abney's counsel asked him if Sergeant Miller told him that Dullworth, Beck, and Sands "had indicated at the time that they spoke to [Sergeant Miller] that they had ever bought drugs off of,

or that they had bought drugs at those times off of Mr. Abney?" *Id.* at 121. The prosecutor objected to the form of the question and asserted that it called for a hearsay conclusion, and the court sustained the objection. Abney's counsel then stated: "Isn't it true in your affidavit you indicated that those individuals, in your search warrant affidavit that resulted in Exhibit 14, the search warrant, that you indicated that . . . ." *Id.* The prosecutor objected to defense counsel reading from documents not in evidence, and the court sustained the objection. Abney's counsel asked Officer Martin if Acord told him that he sold drugs, the prosecutor objected on the basis of hearsay, and the court sustained the objection. Abney's counsel asserted: "I believe he already answered that in his direct examination (inaudible)." *Id.* The court stated: "Well, at this point I'll sustain the objection." *Id.*

[12] After the State rested, Abney's counsel moved for a directed verdict on Count 1 which was denied During the direct examination of Sergeant Miller, Abney's counsel asked if Beck, Dullworth, or Sands said they purchased drugs from Abney, the prosecutor objected on the basis of hearsay, and the court sustained the objection. Martin D. Russell ("Martin") testified that he rented a location in Kokomo from Abney's father, he fell behind in his rent, and that he provided a pistol as collateral for his lack of full payment. On cross-examination, Martin testified that he was unaware that Detective Melton questioned Abney and that Abney told Detective Melton that Carrie, Martin's daughter, brought the gun over to him and he gave her fifty dollars as collateral. When asked if Carrie

was a drug addict, Martin answered: "Probably. Yes, sir, she is. Or she was anyway." *Id.* at 152.

[13] During closing argument, Abney's counsel stated:

> What story does the State want you to believe? They want you to believe that Keith Abney is a hardened drug dealer, that he sold heroin from his home, that he was responsible for everything in that home. They don't want you to believe that it was the admitted drug deal [sic], Patrick Acord, who told Sgt. Melton that he was dealing drugs out of that house. They don't want you to believe that it was Patrick Acord that was responsible for all of that evidence of drug dealing in the home.

> \* \* \* \* \*

> So maybe they did find some heroin. But whose was it? Was it [Abney's]? Or the admitted drug dealer, Patrick Acord?

> \* \* \* \* \*

> No one testified that they ever purchased drugs off of Keith Abney. No one testified that they ever witnessed Keith Abney even using drugs. Was his home used as a place where drugs were used and sold? Yes. . . . Patrick Acord was present. Patrick Acord admitted to Sgt. Melton that he sold drugs.

*Id.* at 165-167. In reply, the prosecutor argued that Acord admitted to Officer Martin only that he sold his prescription pills and that the officers never testified that Acord admitted to selling cocaine or heroin.

[14] The jury found Abney guilty as charged. On July 27, 2016, the court sentenced Abney to 4,380 days for Count 1, 2,190 days for Count 3, 913 days for Count 4, and 913 days for Count 5, to be served concurrently, and ordered that "Count 2 is merged with Count 1." Appellant's Appendix Volume 3 at 55.

## *Discussion*

### I.

[15] The first issue is whether the trial court erred in denying Abney's motion for recusal. Abney points out that the newspaper article stated that the elected prosecutor indicated that he would continue to serve on the advisory committee unless someone instructed him otherwise, that the advisory committee was the trial judge's current re-election committee, the prosecutor was on the letterhead of the trial judge's current re-election campaign, and the article was contemporaneous with his case. He contends the fact that the trial judge's re-election letterhead also contained the names of two chief public defenders did not mitigate the requirement that the trial judge should have recused himself.

[16] The State argues that the Judicial Qualifications Commission found that the trial judge was permitted to preside over criminal cases despite various endorsements. It points out that the article stated that the elected prosecutor, not the prosecutor in Abney's case, had yet to participate in any election committee activities on behalf of the trial judge, and that two members of the chief public defender's office, who were partners in defense counsel's law firm, had also publicly endorsed the judge's candidacy.

[17] Neither party cites Ind. Criminal Rule 12, which sets forth the relevant grounds applicable to requests for changes of judge in criminal cases. *See Voss v. State*, 856 N.E.2d 1211, 1216 (Ind. 2006). The rule provides:

> **(B) Change of Judge--Felony and Misdemeanor Cases.** In felony and misdemeanor cases, the state or defendant may request a change of judge for bias or prejudice. The party shall timely file an affidavit that the judge has a personal bias or prejudice against the state or defendant. The affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. The request shall be granted if the historical facts recited in the affidavit support a rational inference of bias or prejudice.

Ind. Criminal Rule 12(B).

[18] "Adjudicating a request for change of judge based on Rule 12(B) requires an objective, not subjective, legal determination by the judge, who is 'to examine the affidavit, treat the facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice.'" *Voss*, 856 N.E.2d at 1216 (quoting *Sturgeon v. State*, 719 N.E.2d 1173, 1181 (Ind. 1999)). This version of Rule 12 contrasts with the former provisions of Rule 12, which required a party seeking a change of judge to establish actual personal bias. *Id.* Under the present rule:

> A party is entitled to a change of judge only "if the historical facts recited in the affidavit support a rational inference of bias or prejudice." Crim. R. 12(B). This is not limited to cases in which

the judge has expressed an opinion on guilt or innocence or the merits of the case. It does not depend on a subjective showing that the trial judge is actually biased or prejudiced. In considering a motion for change of judge, the challenged judge's ruling does not depend upon a self-assessment of actual bias or prejudice. The judge must instead determine whether the historical facts presented in support of the motion lead to a rational inference of bias or prejudice.

*Id.* (quoting *Allen v. State*, 737 N.E.2d 741, 743 (Ind. 2000)). "A change of judge is neither automatic nor discretionary, but rather requires the trial judge to make a legal determination, not a self-analysis, of actual bias or prejudice." *Id.* (citing *Sturgeon*, 719 N.E.2d at 1181; *Allen*, 737 N.E.2d at 743). "[T]he appropriate standard of review of a trial judge's decision to grant or deny a motion for change of judge under Indiana Criminal Rule 12 is whether the judge's decision was clearly erroneous." *Sturgeon*, 719 N.E.2d at 1182. "Reversal will require a showing which leaves us with a definite and firm conviction that a mistake has been made." *Id.*

[19] Ind. Criminal Rule 12(D) governs the time period for filing a request for change of judge and provides:

> **(D) Time Period for Filing Request for Change of Judge or Change of Venue.** In any criminal action, no change of judge or change of venue from the county shall be granted except within the time herein provided.
>
> > (1) Thirty Day Rule. An application for a change of judge or change of venue from the county shall be filed within thirty (30) days of the initial hearing. Provided, that where

a cause is remanded for a new trial by the court on appeal, such application must be filed not later than thirty (30) days after the defendant first appears in person before the trial court following remand.

(2) Subsequently Discovered Grounds. If the applicant first obtains knowledge of the cause for change of venue from the judge or from the county after the time above limited, the applicant may file the application, which shall be verified by the party specifically alleging when the cause was first discovered, how it was discovered, the facts showing the cause for a change, and why such cause could not have been discovered before by the exercise of due diligence. Any opposing party shall have the right to file counter-affidavits on such issue within ten (10) days, and after a hearing on the motion, the ruling of the court may be reviewed only for abuse of discretion.

[20] The law is settled that a criminal defendant is not entitled to a change of judge where the mandates of Criminal Rule 12 have not been followed. *Flowers v. State*, 738 N.E.2d 1051, 1059-1060 (Ind. 2000) (citing *Smith v. State*, 477 N.E.2d 857, 864 (Ind. 1985); *Welch v. State*, 564 N.E.2d 525, 529 (Ind. Ct. App. 1990)), *reh'g denied*. We note that Abney did not file an affidavit that the judge had a personal bias or prejudice and did not file a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. Abney also did not file his request within thirty days of the initial hearing. While he introduced a newspaper article dated June 10, 2016, as an exhibit on June 24, 2016, he did not specifically allege why such cause could not have been discovered before by the exercise of due diligence. Thus, we cannot say that Abney followed the mandates of Criminal Rule 12 or

that the trial court erred in denying Abney's motion. *See Flowers*, 738 N.E.2d at 1060 (holding that the trial court properly denied a motion for change of judge because of the deficiencies in it including the defendant's failure to file his verified motion for change of judge within the required period of time and failure to allege when he first learned of the grounds for a change of judge or why the grounds could not have been discovered earlier in the exercise of due diligence).

[21] Abney does not cite Ind. Criminal Rule 12 but rather argues that the trial judge should have recused under the Code of Judicial Conduct. In *Mathews v. State*, 64 N.E.3d 1250, 1254 (Ind. Ct. App. 2016), *trans. denied*, we recently rejected the argument that the Code of Judicial Conduct supplies a freestanding mechanism for relief, independent of a properly brought Criminal Rule 12 motion. We held that the obligations in the Code of Judicial Conduct are enforced by the individual judge against himself in the first instance, and in the last instance by disciplinary actions of the Indiana Supreme Court. 64 N.E.3d at 1255. We also held that allowing an independent action under the Code of Judicial Conduct would allow litigants, trial courts, and this Court to usurp the exclusive supervisory authority of the Indiana Supreme Court over judicial conduct. *Id.*

[22] Even if we were to undertake independent review of the trial judge's decision in light of the requirements of the Code of Judicial Conduct, we cannot say that Abney would prevail. *See id.* at 1256 (holding that defendant would not prevail

even if we conducted an independent review of the trial judge's decision in light of the Code of Judicial Conduct).

[23] Canon 2 of the Indiana Code of Judicial Conduct commands: "A Judge Shall Perform the Duties of Judicial Office Impartially, Competently, and Diligently." Ind. Judicial Conduct Rule 2.11 governs the disqualification of judges and provides in part:

> (A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality* might reasonably be questioned, including but not limited to the following circumstances:
>
>> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding

[24] Rule 2.11 contains comments which are provided for "guidance regarding the purpose, meaning, and proper application of the Rules" and to "identify aspirational goals for judges," Ind. Code of Judicial Conduct, Scope at 3-4, including:

> [1] Under this Rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of paragraphs (A)(1) through (6) apply. In many jurisdictions, the term "recusal" is used interchangeably with the term "disqualification."
>
> [2] A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed.

\* \* \* \* \*

[5] A judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification.

Ind. Code of Judicial Conduct Rule 2.11 cmt. 1-2, 5.

[25] Canon 4 of the Indiana Code of Judicial Conduct provides: "A Judge or Candidate for Judicial Office Shall Not Engage in Political or Campaign Activity That is Inconsistent with the Independence, Integrity, or Impartiality of the Judiciary."

[26] Rule 4.4 is titled "Campaign Committees" and provides in part:

(A) A judicial candidate* subject to partisan or nonpartisan election*, and a candidate for retention who has met active opposition, may establish a campaign committee to manage and conduct a campaign for the candidate, subject to the provisions of this Code. The candidate is responsible for ensuring that his or her campaign committee complies with applicable provisions of this Code and other applicable law.*

(B) A judicial candidate shall direct his or her campaign committee:

(1) to solicit and accept only such campaign contributions* as are reasonable;

(2) not to solicit or accept contributions for a candidate's current campaign more than one (1) year before the

applicable primary election, caucus, or general or retention election, nor more than ninety (90) days after the last election in which the candidate participated; and

(3) to comply with all applicable statutory requirements for disclosure and divestiture of campaign contributions.

[27] Comment [3] to Rule 4.4 provides:

At the start of a campaign, the candidate must instruct the campaign committee to solicit or accept only such contributions as are reasonable in amount, appropriate under the circumstances, and in conformity with applicable law. Although lawyers and others who might appear before a successful candidate for judicial office are permitted to make campaign contributions, the candidate should instruct his or her campaign committee to be especially cautious in connection with such contributions, so they do not create grounds for disqualification if the candidate is elected to judicial office. See Rule 2.11.

[28] Both parties discuss *Bloomington Magazine, Inc. v. Kiang*, 961 N.E.2d 61 (Ind. Ct. App. 2012). In that case, Bloomington Magazine, Inc. and Mark Kiang d/b/a Mikado Restaurant, Sunbeam Corp., and Truffles 56 Degrees, Inc. ("Mikado" and "Truffles," respectively, and collectively, "Kiang"), executed two agreements to place advertisements in the magazine for both Mikado and Truffles. 961 N.E.2d at 62. When a dispute as to payment arose, Bloomington Magazine filed claims on December 19, 2008, seeking damages. *Id.* On February 17, 2009, Attorney Geoffrey Grodner entered an appearance on behalf of Kiang. *Id.* On January 4, 2010, the court issued an order finding in favor of Kiang and against Bloomington Magazine. *Id.* Bloomington

Magazine ultimately filed a Motion to Set Aside which asserted that the owner and publisher of the magazine discovered that counsel for Kiang, Grodner, served as Chair for Judge Haughton's campaign committee for the 2008 elections and that the relationship between the judge and opposing counsel was of the type of information that can reasonably be considered relevant to a possible motion for disqualification. *Id.* at 62-63. Bloomington Magazine also filed a motion to recuse. *Id.* at 63. The trial court denied Bloomington Magazine's motions. *Id.*

On appeal, we held that the mere appearance of bias and partiality may require recusal if an objective person, knowledgeable of all the circumstances, would have a rational basis for doubting the judge's impartiality. *Id.* at 64 (citing *Patterson v. State*, 926 N.E.2d 90, 94 (Ind. Ct. App. 2010)).[1] We found that the professional relationship between Judge Haughton and Attorney Grodner, in which Grodner served as the chairman of Judge Haughton's 2008 election committee, was not so remote in time so as to dispel the appearance of an impropriety such that a reasonable person would have a rational basis for doubting her impartiality. *Id.* at 66. We found particularly relevant that Grodner's appearance in the matter was filed in February 2009, which was

---

[1] The court in *Patterson* cited *Thakkar v. State*, 644 N.E.2d 609 (Ind. Ct. App. 1994), which in turn cited Chief Justice Shepard's statement in *Tyson v. State*, 622 N.E.2d 457 (Ind. 1993), in which he denied an application asking him to vacate his earlier disqualification from the case. Chief Justice Shepard wrote that then Canon 3(C)(1) provided that a judge "should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." 622 N.E.2d at 459. He also stated that the "test under Canon 3(C)(1) is whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality." *Id.*

three months following the election at issue. *Id.* at 66-67. Despite the fact that the Motion to Recuse was filed in August 2010, that motion requested recusal from a Trial Rule 60(B) hearing concerning Judge Haughton's failure to recuse herself from a hearing taking place months earlier, in November 2009, at which Attorney Grodner had represented Kiang. *Id.* at 67. We observed that the chronological case summary revealed that following the filing of his appearance and leading up to the bench trial, Grodner filed documents in the matter in Judge Haughton's court in March, April, June, and August 2009. *Id.* We also noted that the Motion to Recuse itself was filed within two years of the 2008 election. *Id.* We remanded for a hearing on Bloomington Magazine's Motion to Set Aside to be heard by a special judge in accordance with Ind. Trial Rule 79. *Id.*

[30] Unlike in *Bloomington Magazine* in which Attorney Grodner served as the chairman of Judge Haughton's election committee, the elected prosecutor was not the chairman and had yet to perform any election committee activities on behalf of Judge Menges at the time of the article. Moreover, Judge Menges took judicial notice that Abney's counsel was a deputy public defender and that the Chief Public Defender and his Chief Deputy were partners of Abney's counsel in his private practice of law and that both of them "agreed to serve in exactly the same role that [the elected prosecuting attorney] has, as willing to publically [sic] endorse my candidacy" and that "we have both sides supporting my candidacy or at least the relationship, the higher parties, if you will, from both sides are supporting my candidacy . . . ." Transcript at 13. Under the

circumstances, we cannot say that an objective person, knowledgeable of all the circumstances, would have a rational basis for doubting the judge's impartiality or that the trial court erred.

## II.

[31] The next issue is whether the trial court abused its discretion in excluding certain evidence. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Even when a trial court errs in excluding evidence, we will not find reversible error where that error is harmless; that is, where the error did not affect the substantial rights of a party. *See* Ind. Trial Rule 61.

[32] Abney argues that the trial court refused to allow him to "explore the fact that Patrick Acord was an admitted drug dealer even though that evidence was already testified to and even though Patrick Acord was present at Abney's house when the search warrant was executed." Appellant's Brief at 13-14 (citation omitted). He asks: "Is it possible the jury may have entertained reasonable doubt as to Abney being THE drug dealer in residence if Abney had been permitted by the Trial Court to go down this line of reasoning?" *Id.* at 14. He also points out that Officer Martin's affidavit stated that Sergeant Miller had talked to Dullworth and Beck on September 30, 2015, and they told him that

heroin was being sold from the residence by Acord. He contends that "denying to the jury known, sworn testimony that contradicts the picture being painted by the State, denies to the jury its right to determine reasonable doubt---and substitutes for that inherent right possessed by [the] jury, the State's (or a court's) determination of sufficiency and reasonable doubt." *Id.* at 15. He also asserts that doing so denies him a fair jury trial and the right to confront all witnesses against him.

[33] The State contends that Abney's claim is waived because he failed to make an offer of proof, and that there was simply no information that Acord was selling heroin. It also contends that, waiver notwithstanding, the court properly excluded statements in the probable cause affidavit because they were hearsay. The State also argues that any alleged error was harmless because the prosecutor presented substantial independent evidence of Abney's guilt.

[34] The record reveals that Sergeant Melton testified that Acord stated that he was "only selling his prescription pills and that he wasn't a heroin dealer" and that Acord "sold, I think they were Oxycodones. They were the blue pills, and so he wanted to take ownership of selling his own prescription because he needed the money, but he didn't say anything about selling heroin." Transcript at 63. On cross-examination, Sergeant Melton testified that Acord admitted to using heroin. During the cross-examination of Officer Martin, Abney's counsel asked if Dullworth, Beck, and Sands had indicated to Sergeant Miller whether they had ever bought drugs from Abney, the prosecutor objected on the basis of hearsay, and the court sustained the objection. Abney's counsel referenced

Officer Martin's affidavit, the prosecutor objected to defense counsel reading from documents not in evidence, and the court sustained the objection. Abney's counsel asked Officer Martin if Acord told him that he sold drugs, the prosecutor objected on the basis of hearsay, and the court again sustained the objection.

[35] With respect to Abney's attempt to reference the affidavit, he does not argue on appeal that the court's ruling to sustain the State's objection was improper. Abney does not point to the record to suggest that he attempted to introduce the affidavit and the trial court denied its admission. He also does not argue that the testimony he sought from Officer Martin did not constitute hearsay or that the court abused its discretion in sustaining the State's objections on the basis of hearsay. Under these circumstances, we cannot say that the trial court abused its discretion.

III.

[36] The next issue is whether the court erred in entering its sentencing order. Abney argues that the sentencing order contains a scrivener's error with respect to Counts 1 and 3 because it states that the court gave him "295 actual days or 393 credit days, day for day credit, served while awaiting trial and disposition in this matter." Appellant's Appendix Volume 3 at 55. He asserts that "'295' time two does not equal '395.'" Appellant's Brief at 15. He also argues that "[t]he Trial Court does not make the same error when it later sentences on Counts 4 and 5--- '295 actual days or 590 credit days. . . .'" *Id.* The State

contends that there is no scrivener's error in the sentencing order, that Abney does not receive day-for-day credit on Count 1 because it is a level 3 felony, that he received ninety-eight good time credit days, one for every three that he served for his level 3 felony sentence, and that when added together, 295 days of actual credit plus ninety-eight days of good time credit, Abney correctly received 393 days of credit.

[37]     The sentencing order states:

> The Defendant is now sentenced on Count 1 to the Indiana Department of Correction for 4380 days, all executed.
>
> Count 2 is merged with Count 1[.]
>
> On Count 3 the Defendant is sentenced to the Indiana Department of Correction for 2190 days, all executed.
>
> On Counts 1 and 3, the Defendant shall receive jail time credit in the sum of 295 actual days or 393 credit days, day for day credit, served while awaiting trial and disposition in this matter.
>
> On Count 4 the Defendant is sentenced to the Indiana Department of Correction for 913 days, all executed.
>
> On Count 5 the Defendant is sentenced to the Indiana Department of Correction for 913 days, all executed.
>
> On Counts 4 and 5 the Defendant shall receive jail time credit in the sum of 295 actual days or 590 credit days, day for day credit, served while awaiting trial and disposition in this matter.

Appellant's Appendix Volume 3 at 55.

[38]     Ind. Code § 35-50-6-4(b) provides that a person "who is not a credit restricted felon; and . . . who is imprisoned for a crime other than a Level 6 felony or misdemeanor or imprisoned awaiting trial or sentencing for a crime other than a Level 6 felony or misdemeanor . . . is initially assigned to Class B." Count 1 was dealing in a narcotic drug as a level 3 felony, and Count 3 was possession of cocaine as a level 5 felony. Thus, Abney was initially assigned to Class B pursuant to Ind. Code § 35-50-6-4(b). Ind. Code § 35-50-6-3.1(c) provides that "[a] person assigned to Class B earns one (1) day of good time credit for every three (3) days the person is imprisoned for a crime or confined awaiting trial or sentencing." Abney does not challenge the court's finding that he had 295 actual days. A person assigned to Class B would receive one day of good time credit for every three days the person is imprisoned. Thus, Abney would have received approximately ninety-eight days of good time credit for a total credit time of 393 days. Accordingly, we do not disturb the court's sentencing order.

## *Conclusion*

[39]     For the foregoing reasons, we affirm Abney's convictions and sentence.

[40]     Affirmed.


Vaidik, C.J., and Bradford, J., concur.