## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 18 2020, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
CHILD ADVOCATES, INC.

Janice Mandla Mattingly
Janice Mandla Mattingly, P.C.
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship, Ki.H., K.H., and Kr.H. (Minor Children),

and

K.D.H. (Father),

*Appellant-Respondent*,

November 18, 2020

Court of Appeals Case No. 20A-JT-263

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Peter Haughan, Magistrate

Indiana Department of Child Services,

*Appellee-Petitioner*,

and

Child Advocates, Inc.

*Appellee-Guardian ad Litem*.

Trial Court Cause Nos.
49D15-1809-JT-1145
49D15-1809-JT-1146
49D15-1809-JT-1147

**Brown, Judge.**

[1] K.D.H. ("Father") appeals the involuntary termination of his parental rights to his children, Ki.H., K.H., and Kr.H.[1]  We affirm.

*Facts and Procedural History*

[2] Father's several children include Ki.H. who was born on June 23, 2015, and K.H. and Kr.H. (the "Twins," and with Ki.H., the "Children"), who were born on September 23, 2017.  The Twins were removed from their parents' care on the day they were born, and on September 26, 2017, Ki.H. was removed and the Indiana Department of Child Services ("DCS") filed a petition alleging the Children were children in need of services ("CHINS") and that their mother tested positive for codeine, morphine, and heroin during pregnancy.  Also on

---

[1] The children's mother signed consents to adoption and was dismissed from the termination case on August 26, 2019, and she died on or about September 5, 2019.

September 26, 2017, the court held an initial hearing at which Father was present, appointed counsel for Father upon request, and ordered supervised parenting time. Upon the Twins's release from the hospital, the court approved a placement in either kinship, relative, or foster care for the Children.

[3] On January 10, 2018, the court held a hearing at which Father was not present, Father's counsel waived factfinding, and the court entered CHINS adjudications with respect to the Children upon admission by their mother. On February 7, 2018, the court entered a dispositional decree; awarded DCS wardship of the Children; authorized increased parenting time up to and including temporary trial visitation upon positive recommendation from the guardian ad litem, DCS, and service providers; ordered Father to participate in drug screens; and indicated that, if he had ten consecutive, clean, random drug screens, he would no longer be required to screen. At a permanency hearing at which counsel represented Father, who was not present, the court made a finding that Father was incarcerated and changed the permanency plan to adoption.

[4] On September 27, 2018, DCS filed a petition to terminate Father's parental rights, and a TPR Summons And Notice of Hearing indicates Father was served in October 2018 at the Henderson County Detention Center in Henderson, Kentucky. On October 12, 2018, the court issued an order which continued the initial hearing and appointed Child Advocates, Inc., as guardian ad litem for the Children. The order indicates that it was "RECOMMENDED BY:" Magistrate Larry E. Bradley. Appellant's Appendix Volume II at 79. The

court's order from the continued initial hearing on November 9, 2018, which was also "[r]ecommended by" Magistrate Bradley, indicates "Ryan Gardner" appeared as a "GAL Attorney" and the court set the matter for pre-trial conference and appointed a public defender for Father. *Id.* at 110-112 (some capitalization omitted).

[5] On February 20, 2019, DCS filed a motion to transport Father from the Henderson County Detention Center, or alternatively to allow him to participate by telephone or videoconference in the termination trial. An order recommended by Magistrate Bradley denied the motion to transport Father but allowed him to appear by videoconference. In response to DCS's filing of a second motion to transport, the court issued an order on July 2, 2019, which denied the motion to transport but allowed appearance by videoconference and was approved and ordered by "Ryan K. Gardner, Judge." *Id.* at 156.

[6] On July 25, 2019, Larry E. Bradley filed, as a volunteer attorney, an E-Filing Limited Appearance form for Child Advocates, Inc. On July 29, 2019, the court continued the trial set for that day in an order which noted that: "Ms. Berg[, Father's counsel,] is requesting Mr. Bradley, GAL Attorney, withdraw from the case as there is conflict." *Id.* at 163. The same day, Child Advocates filed a Motion to Withdraw Appearance requesting to remove volunteer attorney Bradley, which the court granted.

[7] Magistrate Peter Haughan of the Juvenile Division of the Marion Superior Court presided over Father's termination hearing which was held on September

26, 2019, October 31, 2019, and November 6, 2019. The court issued a set of three orders, with each corresponding to a certain half-day hearing. The court's November 6, 2019 order was "APPROVED & ORDERED BY:" Judge Pro Tempore Ryan K. Gardner, whereas Judge Mark A. Jones of the Juvenile Division of the Marion Superior Court had approved and ordered the previous half-day hearings. *Id.* at 205.

[8]     On January 5, 2020, the court issued its "Order Terminating the Parent-Child Relationship Between the Parent, [Father], and the Children," which was signed by Magistrate Haughan and Judge Jones. The court found that a November 4, 2013 order[2] had terminated the parent-child relationship between Father and his two older children, born in 2003 and 2004; CHINS petitions had been filed with respect to the older children in 2011 based on lack of appropriate supervision by their mother; Father was incarcerated and his ability or willingness to parent had not been demonstrated and the children were later found to be in need of services; Father was released from prison around July of 2012 but failed to contact DCS until attending a CHINS hearing in late November of 2012 and; the dispositional order was modified to provide home based services which Father failed to complete. The order observed that Father was convicted in July 2013 of Assisting a Criminal, anticipated being released

---

[2] The November 4, 2013 order recommended by Magistrate Bradley states that Ryan Gardner appeared as counsel for Child Advocates, Inc..

on April 15, 2014, and had a criminal record at twenty-five years of age consisting of five felony convictions and two misdemeanor convictions.

[9] The January 2020 termination order further found that, since the termination of Father's parental rights regarding his older children, he has had at least one felony conviction in 2015 for which the court issued five warrants ordering that he be taken into custody and, subsequent to the conviction, found him to have violated the terms of his sentence or probation and ordered his incarceration; one felony charge and several misdemeanor charges in 2017; and two felony charges and misdemeanor charges in 2018. The order found that, as Father served the sentence associated with the 2015 conviction, he received two probation violations resulting in further incarceration, and that, at the time of the court's termination order, he still faced outstanding warrants in the proceedings related to the 2017 and 2018 charges. It indicated Father testified at a fact-finding hearing that he was incarcerated in a United States penitentiary in Kentucky, where he had been since April 2018 because of a conviction of the federal offense of possession of a firearm; he received a sixty-month federal sentence, still had two years of incarceration to serve, and would then be moved to a halfway house to engage in work and rehabilitative programs; he has not seen the Children in person since he became incarcerated but communicated via computer tablet with the younger children and via telephone with Ki.H.; and that the inmates are frequently on lockdown, so Father has not been able to engage in any programs or communicate with the Children.

[10]     The court further found that, prior to his incarceration, Father's parenting time remained supervised and the Children were never placed in his care and that the Twins were placed shortly after birth with Father's uncle and his uncle's partner, have special medical conditions, and have behaviors that can escalate quickly into tantrums. It found that the Father's uncle and his uncle's partner both take them to their doctor appointments, their home is the only home the Twins have ever known, and they provided for the needs and are willing to adopt them if Father's parental rights were terminated. It indicated the Twins were loved and well-cared for and Father's uncle was concerned with Father's sobriety and believed he needed help.

[11]     Based upon the testimony of Family Case Manager Patrick Wilburn ("FCM Wilburn"), the court found that Father had been incarcerated throughout most of the pendency of the Children's CHINS cases and did not successfully complete random drug screens, the Children have never been placed with Father and he did not want placement of them, he did not want to complete random drug screens or the Father's Engagement program, and he does not have the ability or willingness to provide the Children with a safe and stable permanent home or provide for their short-term and long-term needs. It stated FCM Wilburn believed the conditions that led to the removal and retention of the Children from Father's care and custody have not been remedied; the continuation of the parent-child relationship is a threat to the well-being of the Children; and it is in the best interests of the Children that Fathers' parental rights be terminated. Furthermore, based upon the testimony of guardian ad

litem Ed Walker ("GAL Walker"), it found that Father reported to GAL Walker in October 2017 that he did not want to be considered for placement of the Children, but that he would participate in the services of substance abuse evaluation and treatment, random drug screens, and the Father's Engagement program; the referrals for these services were made on Father's behalf; and Father did not engage in these services. It indicated GAL Walker was never able to recommend that Father have unsupervised parenting time due to his decision not to participate in services and his subsequent incarceration and that GAL Walker, who visited the Children many times, believed it is in the Children's best interests that Father's parental rights be terminated and the Children be adopted by their current respective caregivers.

[12] The order then found the conditions that led to the Children's removal – Father's criminal behavior and the accompanying incarceration, problems with alcohol and/or substance abuse, and lack of ability or willingness to parent the Children – had not been remedied. In finding that it was highly probable that these conditions would not be remedied, even if Father was given additional time to remedy the conditions, the court stated: the Children's CHINS cases have been open for over two years; Father continues to engage in criminal behavior that results in his incarceration he is currently serving a federal sentence and will not be released for at least two years; he has state charges pending; Father has not engaged in any services that could assist him to remedy these conditions; from the beginning of the CHINS cases, Father has done nothing to demonstrate that he has the ability or willingness to parent the

Children and to provide them with a safe and stable home; and there is a substantial probability that future neglect or deprivation will occur because of his failure to remedy the conditions. The court found a reasonable probability that the continuation of the parent-child relationship between Father and the Children poses a threat to their well-being and that DCS had shown by clear and convincing evidence that termination of the parent-child relationship between Father and the Children is in the best interests of the Children.

## *Discussion*

[13]     The United States Supreme Court "has 'recognized on numerous occasions that the relationship between parent and child is constitutionally protected,' and that '[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.'" *In re Adoption of C.B.M.*, 992 N.E.2d 687, 692 (Ind. 2013) (internal quotations omitted) (quoting *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549 (1978); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388 (1982)). However, these protected parental rights are not absolute and must be subordinated to the children's interests to maintain the parent-child relationship. *Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 147 (Ind. 2005). Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004)).

[14]     When reviewing the termination of parental rights, we do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *See In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.* Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence. *Id.* Our review must give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand and not set aside its findings or judgment unless clearly erroneous. *Id.* "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

[15]     The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for

placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[16] We first address Father's argument that Indiana Code § 31-35-2-4 is unconstitutional on its face and as applied because it lacks a requirement that DCS "first provide services to attempt reunification of the parent and child during the CHINS proceedings prior to moving to termination of parental rights – services required by DCS procedural manuals," and, in "failing to require DCS to perform its published procedures uniformly prior to moving for termination," it creates the conditions for similarly situated parents to be treated unequally. Appellant's Brief at 45-46. He contends DCS failed to comply with its own manuals regarding services, the FCM never attempted to provide him

with services before recommending termination of his parental rights, and DCS should have reassessed "the best way to provide services to assist" him and the Children. *Id.* at 49. DCS maintains that Father raises this challenge for the first time on appeal, and because he had the chance to raise it during the termination factfinding but failed to do so, he should be deemed to have forfeited review of whether Indiana Code § 31-35-2-4 is constitutional. *See* Appellee DCS's Brief at 43 ("Dissimilar to waiver, 'which involves the intentional relinquishment or abandonment of a known right, "forfeiture is the failure to make the timely assertion of a right[.]"'") (quoting *Plank v. Cmty. Hosps. of Ind., Inc.*, 981 N.E.2d 49, 54 (Ind. 2013)).

[17] "Challenges to the constitutionality of a civil statute may be waived if they could have been raised to the trial court but the appellant failed to do so." *In re R.S.*, 774 N.E.2d 927, 929 (Ind. Ct. App. 2002), *trans. denied*. Our review of the record reveals that Father did not raise the issue of the constitutionality of Indiana Code § 31-35-2-4 before the trial court. Accordingly, we find he has waived the issue. *See Leonard v. State*, 80 N.E.3d 878, 884 n.4 (Ind. 2017) (citing *Plank.*, 981 N.E.2d at 53 ("Declining to review an issue not properly preserved for review is essentially a cardinal princip[le] of sound judicial administration." (internal quotation omitted))).

[18] Waiver notwithstanding, the record reveals that the services provided Father were not insufficient under the circumstances and that he was not deprived of due process. To the extent Father relies on *In re T.W.*, in that case this Court examined the requirements of due process in the context of termination

proceedings and stated it was led to "one conclusion: for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case," that "[w]hat constitutes 'reasonable efforts' will vary by case," and that "does not necessarily always mean that services must be provided to the parents." 135 N.E.3d 607, 615 (Ind. Ct. App. 2019), *trans. denied.* The record reveals Father spoke with GAL Walker at a October 2017 child and family team meeting where he shared that "he didn't think that services would be beneficial to him at that time, and at that time, um, chose not to or said he wasn't going to participate in services." Transcript Volume II at 40. It also reveals that, although he was eventually offered and began certain services through the Father's Engagement program, he did not complete those services. Furthermore, Father did not engage in drug screens, which the court ordered in its dispositional decree in the CHINS case, before being incarcerated. In light of the record, reversal based on the application of Indiana Code § 31-35-2-4 in this case is not warranted, and we cannot say that Father's due process rights were violated. *See In re H.L.*, 915 N.E.2d 145, 148 (Ind. Ct. App. 2009) (observing that the absence of services was due to the father's incarceration and that he did not point to any evidence that he specifically requested visitation or other services, and holding that the inability to provide services did not amount to a denial of due process).

[19] Turning to Father's argument that attorneys/judicial officers Gardner and Bradley's vacillating roles as attorneys and judicial officers violated conflicts of

interest concerns for attorneys and impartiality requirements for judicial officers to such an extent that he was "deprived . . . of the most basic concepts of fundamental fairness in court proceedings and tainted the process in a manner that requires reversal for new proceedings," Appellant's Brief at 35, we initially observe that the Indiana Code of Judicial Conduct provides that a "judge shall disqualify himself . . . in any proceeding in which the judge's impartiality might reasonably be questioned . . . ." Ind. Judicial Conduct Rule 2.11(A). Rule 2.11 lists several specific instances requiring recusal, including cases where the judge has "served as a lawyer in the matter in controversy . . . . " *Id.* at (A)(6). The Comment to Rule 2.11 notes that a judge's obligation not to hear or decide matters under the Rule "applies regardless of whether a motion to disqualify is filed." Jud. Cond. R. 2.11 cmt. [2]. To the extent that Father argues specific violations of the Code of Judicial Conduct,[3] this Court rejected the argument that the Code of Judicial Conduct supplies a freestanding mechanism for relief, *see Mathews v. State*, 64 N.E.3d 1250, 1254 (Ind. Ct. App. 2016), *trans. denied*, and

> held that the obligations in the Code of Judicial Conduct are
> enforced by the individual judge against himself in the first

---

[3] We note Father also points to Indiana Professional Conduct Rule 1.12, which is titled "Former Judge, Arbitrator, Mediator or Other Third-Party Neutral" and provides that a "lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer, arbitrator, mediator or other third-party neutral, or law clerk to such a person, unless all parties to the proceeding give informed consent, confirmed in writing." While Bradley did file an appearance on July 29, 2019, as a volunteer attorney on behalf of Child Advocates, the guardian ad litem, he filed a motion to withdraw on the same day, and his appearance was withdrawn upon the realization he had been previously involved in the case.

instance, and in the last instance by disciplinary actions of the Indiana Supreme Court. We also held that allowing an independent action under the Code of Judicial Conduct would allow litigants, trial courts, and this Court to usurp the exclusive supervisory authority of the Indiana Supreme Court over judicial conduct.

*Abney v. State*, 79 N.E.3d 942, 951 (internal citations removed) (citing *Mathews*, 64 N.E.3d at 1255). Even if we were to undertake independent review of the circumstances in light of the requirements of the Code of Judicial Conduct, we cannot say that Father would prevail. *See Mathews*, 64 N.E.3d at 1256 (holding the defendant would not prevail even if we conducted an independent review in light of the Code of Judicial Conduct). Unlike in *Bloomington Magazine, Inc. v. Kiang*, 961 N.E.2d 61 (Ind. Ct. App. 2012), on which Father relies and in which this Court found that there was the appearance of impropriety because one of the attorneys served as chairman of the judge's recent election campaign and the trial court abused its discretion in denying a motion to recuse herself, *see L.G. v. S.L.*, 88 N.E.3d 1069, 1071 (Ind. 2018) (discussing *Bloomington*), the record does not support that Magistrate Haughan, who conducted the termination of parental rights trial, or Judge Jones, as the second judicial officer who signed the termination order were influenced by the actions of either attorneys/judicial officers Bradley and Gardner. *Cf. Bloomington*, 961 N.E.2d at 64 (noting that the mere appearance of bias and partiality may require recusal if an "objective person, knowledgeable of all the circumstances, would have a rational basis for doubting the judge's impartiality." (citing *Patterson v. State*, 926 N.E.2d 90, 94 (Ind. Ct. App. 2010)). And, despite then-Magistrate Bradley and

then-Attorney Gardner's involvements in a 2018 initial hearing, and then-Judge Pro Tempore Gardner's approval of a November 2019 order summarizing the half-day events of the termination hearing date; and, while then-Magistrate Bradley and then-judicial officer Gardner[4] may have signed separate pre-trial orders in 2019 that denied motions to transport and directed video conferencing or telephonic appearances for Father who was incarcerated, we do not find that Father has overcome the presumption against personal bias or prejudice. *See L.G. v. S.L.*, 88 N.E.3d at 1073 ("Adverse rulings and findings by a trial judge are not sufficient reason to believe the judge has a personal bias or prejudice. . . . The law presumes that a judge is unbiased and unprejudiced. To overcome this presumption, the moving party must establish that the judge has personal prejudice for or against a party. Such bias or prejudice exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before him." (internal citations removed)).[5]

[20] We next turn to Father's argument that the termination order is not supported by clear and convincing evidence. As noted, the involuntary termination statute is written in the disjunctive and requires proof of only one of the

---

[4] Although the July 2, 2019 order indicated "Judge" below the approval signature line, we note that Indiana's Directory of Courts & Clerks lists Ryan Gardner as a Magistrate. *See* DIRECTORY OF COURTS & CLERKS IN INDIANA 28, https://www.in.gov/judiciary/files/court-directory.pdf (last accessed November 5, 2020). *See also* COURTS & CLERKS OFFICES, Courts.IN.Gov., https://www.in.gov/judiciary/2794.htm (last accessed November 5, 2020).

[5] While the misconduct here did not deprive Father of due process, we admonish against the practice of appearing as an attorney and a judicial officer in the same case and underscore the importance of monitoring against such conflicts.

circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). In determining whether the conditions that resulted in a child's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's drug abuse, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* While incarceration alone cannot serve as a basis for termination

of parental rights, it is well-settled that a trial court may evaluate the parent's habitual patterns of conduct to assess the likelihood that the child or children could experience future neglect or deprivation; and give considerable weight to the parent's history of incarceration and the effects upon the child or children. *See A.D.S. v. Ind. Dep't of Child Services*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (holding that the parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child, that DCS is not required to prove a parent has no possibility of changing; and that DCS need only establish a reasonable probability that no change will occur), *trans. denied*.

[21] To the extent Father does not challenge certain findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[22] The record reveals Father's pattern of continued involvement with law enforcement. In Indiana, he received at least one felony conviction in 2015; one felony charge in 2017 and several misdemeanor charges; and two felony charges in 2018, among other misdemeanor charges. As he served the sentence associated with the 2015 conviction, Father received two probation violations resulting in further incarceration, and at the time of the court's termination order he still faced outstanding warrants in the proceedings related to the 2017 and 2018 charges. Furthermore, as of the fact-finding hearing, Father was incarcerated in a United States penitentiary in Kentucky, where he had been

since April 2018 because of a conviction of the federal offense of possession of a firearm. He testified during the fact-finding hearing that he still had two additional years of incarceration to serve and would then be moved to a half-way house to engage in work and rehabilitative programs. FCM Wilburn testified that the Children need permanency and a safe and stable home environment, both of which Father was unable to provide, and that the reason the Children were removed had not been remedied, because they "need to be taken care of and he's unable to do that at this time." Transcript Volume II at 30. The court found that the Children have never been placed with Father; Father did not want placement of them; he did not want to complete the services which had been ordered for him or those referred for him; and he does not have the ability or willingness to provide the Children with a safe and stable permanent home or provide for their short-term and long-term needs. In light of the unchallenged findings and evidence set forth above and in the record, we cannot say the trial court clearly erred in finding that a reasonable probability exists that the conditions resulting in the Children's removal or the reasons for their placement outside Father's care will not be remedied.

[23] In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, the

recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *A.D.S.*, 987 N.E.2d at 1158-1159. Both FCM Wilburn and GAL Walker testified that termination of the relationship between Father and the Children was in their best interests. Based on the testimony, as well as the totality of the evidence as set forth in the record and termination order, we conclude that clear and convincing evidence supports the trial court's determination that termination is in the Children's best interests.

[24]    Affirmed.

Robb, J., and Crone, J., concur.