

IN THE

# Court of Appeals of Indiana

Kevin Hamilton,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 12 2024, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 12, 2024

Court of Appeals Case No.
23A-PC-15

Appeal from the Allen Superior Court

The Honorable Frances C. Gull, Judge

Trial Court Cause No.
02D06-1903-PC-000025

**Opinion by Judge Felix**
Judge Crone concurs in part and concurs in result in part with separate opinion.
Judge Brown dissents with separate opinion.

**Felix, Judge.**

## Statement of the Case

[1] Kevin Hamilton filed a petition for post-conviction relief ("PCR"), alleging ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and that new evidence exists regarding sentencing. When he filed the petition, he also filed a motion for change of judge (the "Motion"). The PCR court denied both Hamilton's petition and the Motion. Hamilton appeals those denials and presents four issues for our review, which we revise and restate as the following two issues:

1. Whether the PCR court clearly erred when it denied the Motion;
2. Whether the PCR court clearly erred when it denied Hamilton's PCR petition.

[2] We affirm.

## Facts and Procedural History

### Trial, Sentencing, and Direct Appeal

[3] In 2017, a jury convicted Hamilton of murder, robbery as a Level 2 felony, and an enhancement for use of a firearm in the commission of a felony. We have previously set out the facts underlying those convictions:

> On August 13, 2016, Hamilton and his friend, Devyn Yancey ("Yancey"), were exchanging text messages regarding the fact that marijuana they had purchased from Brian Quintana ("Quintana") was ten grams short. Hamilton and Yancey decided to rob Quintana the next day, during an arranged buy.

Via text, Yancey assured Hamilton that Quintana would have only one person with him, if anyone, and that no one would be armed. Hamilton said he would bring his .9–millimeter handgun. Referring to the robbery, Hamilton texted, "Sounds easy. Let's do it."

On August 14, 2016, Hamilton picked up Yancey, and they drove to the parking lot of the Woodbridge Apartments in Allen County, where Quintana was waiting in his car. Yancey and Hamilton entered Quintana's car; Yancey sat in the passenger seat, and Hamilton, brandishing his gun, sat in the back. Seeing the handgun, and understanding that he was being robbed, Quintana tried to wrestle the gun out of Hamilton's hand. Yancey went around to the driver's side door and started hitting Quintana. This allowed Hamilton to secure his gun and exit the car. As Yancey and Quintana continued to struggle in the front seat of the car, Hamilton fired his gun through the back windshield, striking Quintana in the right lower chest. Yancey grabbed a bag of Quintana's marijuana, and he and Hamilton fled from the scene.

When police arrived at the scene, Quintana told them that Hamilton had shot him. Following a search, police tracked down Hamilton and arrested him. Quintana died from his injuries, and on August 18, 2016, Hamilton was charged with murder, felony murder, robbery as a Level 2 felony, and an enhancement for use of a firearm in the commission of a felony. A jury trial was conducted from March 7 through 9, 2017. . . . Hamilton was found guilty of all charges.

*Hamilton v. State*, 95 N.E.3d 218, No. 02A03-1704-CR-932, slip op. at ¶¶ 3–5

(Ind. Ct. App. Dec. 29, 2017) (record citations omitted), *trans. denied*.

[4]     At trial and sentencing, John Bohdan represented Hamilton. At the sentencing hearing, Bohdan presented four mitigating factors: (1) Hamilton was a minor—17 years old—at the time of the offense, (2) Hamilton lacked an adult criminal history, (3) the circumstances of the crime were unlikely to reoccur, and (4) Hamilton was the father of a young son. In particular, Bohdan argued that Hamilton had "an undeveloped juvenile mind," which resulted in "the tragic results of what happened [not being] as foreseeable for" Hamilton. Sent. Tr. Vol. I at 6. Bohdan also argued that Hamilton, who was already a father of one child, had a "good influence on his child's upbringing." *Id.* The trial court heard testimony from Quintana's father about how much he missed his son. The trial court also reviewed Hamilton's presentence investigation report and letters from Hamilton's mother and girlfriend.

[5]     Hamilton addressed the trial court, as well:

> It doesn't matter what I say, it will never explain how sorry I am. And I don't expect you to forgive me, I wouldn't. . . . I never had the intention to take your son's life. . . . I would give my life for him to have his back, but I can't. The only thing I can do though is sit in prison for the rest of my life. And if that's what I have to do to make things right then I'll do it and I'm sorry. . . . I don't want to be defined by what I did when I was a kid. And I'm not gonna blame that on me being a kid, I just – I was dumb. . . . I'm not innocent, I know I'm guilty. I know I was guilty, I just don't agree with what was brought to me. Murder, I know I'm not guilty of murder. I'm not a murdere[r], I'm not a killer. I could never. But what I did, someone did die and I know I did that.

Sent. Tr. Vol. I at 11–12.

[6] The trial court found two aggravating factors: (1) Hamilton's failed attempts at rehabilitation after two informal juvenile adjustments, and (2) the nature and circumstances of the offense. The trial court found two mitigating factors: (1) Hamilton was a minor at the time of the offense, and (2) Hamilton's incarceration would be an undue hardship for his son. The trial court did not consider Hamilton's lack of an adult criminal history to be a mitigating factor because Hamilton had a history of juvenile involvement. The trial court also declined to consider as a mitigating factor that the circumstances of Hamilton's offense were unlikely to reoccur. Based on the aggravating and mitigating factors, the trial court sentenced Hamilton to a total of 74 years in the Indiana Department of Correction: 55 years for murder, 9 years for robbery as a Level 3 felony,[1] and 10 years for use of a firearm in the commission of a felony, all to be served consecutively.

[7] On direct appeal, Thomas Allen represented Hamilton. Allen raised three issues on Hamilton's behalf for our consideration:

> I. Whether the trial court erred in merging Hamilton's felony murder conviction with his murder conviction;

> II. Whether reducing Hamilton's conviction from Level 2 felony robbery to Level 3 felony robbery for purposes of sentencing

---

[1] Although Hamilton was convicted of robbery as a Level 2 felony, the sentencing court reduced the conviction to a Level 3 felony. The issue of this reduction was addressed in Hamilton's direct appeal. *Hamilton*, No. 02A03-1704-CR-932, slip op. at ¶¶ 10–17.

remedied double jeopardy violations under Indiana's Double Jeopardy Clause; and

III. Whether the trial court erred by allowing the jury to hear evidence on the enhancement—use of a firearm in the commission of an offense causing death or serious bodily injury—at the same time the jury heard evidence on the other counts.

*Hamilton*, No. 02A03-1704-CR-932, slip op. at ¶ 1. We affirmed Hamilton's convictions, *id.* at ¶¶ 9, 17, 23, 24, and the Indiana Supreme Court denied transfer, *Hamilton v. State*, 97 N.E.3d 236 (Ind. 2018).

## Post-Conviction Proceedings

[8] On March 12, 2019, Hamilton filed a PCR petition, which he later amended. In addition to his initial petition, Hamilton also filed the Motion (requesting a change of judge) along with an accompanying affidavit by Hamilton (the "Affidavit"). The PCR court denied the Motion without hearing because "the Affidavit attached does not support a rational inference of personal bias or prejudice against the Petitioner." Appellant's App. Vol. II at 27. The PCR court also denied Hamilton's motion to reconsider this issue, as well as Hamilton's subsequent motion to certify these denials for interlocutory appeal.

[9] At the evidentiary hearing, Hamilton questioned Bohdan about his current employment. Bohdan testified that he is the magistrate for the Allen Superior Court and that he is employed by all three Criminal Division judges, including the PCR judge. Hamilton then renewed the Motion, and the PCR court denied

it once again, noting "that the [A]ffidavit does not contain any information, as I indicated in my Order, on historical bias against the Defendant." Tr. Vol. II at 8. Hamilton then proceeded to present evidence regarding his claims that he received ineffective assistance of trial counsel, he received ineffective assistance of appellate counsel, and he is entitled to a new sentencing hearing based on newly discovered evidence. After the hearing, Hamilton and the State submitted proposed orders. The PCR court ultimately denied Hamilton's petition. This appeal ensued. Additional facts are set forth below.

## Discussion and Decision

### 1. Denial of the Change of Judge Motion

[10] Hamilton argues that the PCR court clearly erred when it denied the Motion. Hamilton specifically contends that the PCR court's decision is in violation of Indiana Post-Conviction Rule 1(4)(b), Indiana Code of Judicial Conduct ("CJC") Rule 2.11(A), and the Due Process Clause of Fourteenth Amendment[2] of the United States Constitution. We address each basis in turn.

#### a. *Post-Conviction Rule 1(4)(b)*

[11] Post-Conviction Rule 1(4)(b) provides in relevant part:

---

[2] In the Motion and on appeal, Hamilton points us to both the Fifth Amendment and the Fourteenth Amendment. The Fifth Amendment deals in relevant part with due process in *criminal* proceedings. *See* U.S. Const., amend. V. PCR proceedings are *civil* proceedings, *see* Ind. Post-Conviction Rule 1; *Gibson v. State*, 133 N.E.3d 673, 681 (Ind. 2019), so the Fifth Amendment's due process clause is inapplicable to the Motion.

> Within ten (10) days of filing a petition for post-conviction relief under this rule, the petitioner may request a change of judge by filing an affidavit that the judge has a *personal* bias or prejudice *against the petitioner*. The petitioner's *affidavit* shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be accompanied by a certificate from the attorney of record that the attorney in good faith believes that the historical facts recited in the affidavit are true. A change of judge shall be granted if the historical facts cited in the affidavit support a rational inference of bias or prejudice.

(Emphases added). A bias is "personal" under Post-Conviction Rule 1(4)(b) "if it stems from an extrajudicial source—meaning a source separate from the evidence and argument presented at the proceedings." *Pruitt v. State*, 903 N.E.2d 899, 939 (Ind. 2009) (quoting *Lambert v. State*, 743 N.E.2d 719, 728 (Ind. 2001)). Personal bias or prejudice generally "exists only where there is an undisputed claim or the judge has expressed an opinion on the merits of the controversy before [the court]." *Robinson v. State*, 218 N.E.3d 17, 29 (Ind. Ct. App. 2023) (quoting *L.G. v. S.L.*, 88 N.E.3d 1069, 1073 (Ind. 2018)), *trans. not sought*.

[12] A change of judge pursuant to Post-Conviction Rule 1(4)(b) is neither "automatic" nor "discretionary"; instead, it calls for a legal determination. *Pruitt*, 903 N.E.2d at 939 (quoting *Lambert*, 743 N.E.2d at 728). In making this determination, the PCR court must "examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice." *Id.* (quoting *Lambert*, 743 N.E.2d at 728). We review a PCR court's ruling on a motion for change of judge under

the clearly erroneous standard. *Robinson*, 218 N.E.3d at 30 (citing *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003)). We will reverse only upon a showing that "leaves us with a definite and firm conviction that a mistake has been made." *Id.* (citing *Garland*, 788 N.E.2d at 433). This is a heavy burden, especially because we presume that the PCR judge is not biased against a party and because disqualification is not required under Post-Conviction Rule 1(4)(b) "unless the judge holds a '*personal* bias or prejudice.'" *Pruitt*, 903 N.E.2d at 939 (quoting *Lambert*, 743 N.E.2d at 728). That is, to overcome the presumption that the PCR judge is unbiased, the party requesting the change of judge must demonstrate that the PCR judge has an actual personal bias or prejudice against him. *See id.* (quoting *Lambert*, 743 N.E.2d at 728).

[13] Hamilton's Affidavit contained only three allegations:

> 1. I was charged with multiple offense[s], including Murder, in Cause No. 02D06-1608-MR-5.
>
> 2. At the trial level, I was represented by Mr. John Bohdan.
>
> 3. I believe he is now an Allen County magistrate working for Judge Gull who presided over my case and sentencing.

Appellant's App. Vol. II at 19.

[14] Hamilton does not include any allegations in the Affidavit that would support a rational inference that the PCR judge is biased against him for any reason, including because of the PCR judge's alleged employer-employee relationship

with Bohdan. Based on our standard of review and the requirements of Post-Conviction Rule 1(4)(b), we cannot say that the PCR court clearly erred in denying the Motion on this ground.

### b. CJC Rule 2.11(A)

[15] CJC Rule 2.11(A) provides that a "judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," including under certain circumstances such as when a judge's family member is a party to the proceeding or the judge served as a lawyer in the controversy. We initially observe that an employment relationship does not fall within any of the specifically enumerated categories of relationships that may give rise to the appearance of impartiality. Ind. Judicial Conduct Rule 2.11(A)(1)–(6). Therefore, Hamilton's argument falls under the general provision of CJC Rule 2.11(A). *See* Jud. Cond. R. 2.11(A), cmt. 1.

[16] Before we begin an analysis of the facts of this cases under CJC Rule 2.11(A), it is important to note that in *Mathews v. State*, another panel of this court held that CJC Rule 2.11(A) does not create a freestanding right of enforcement by a private party. 64 N.E. 3d 1250, 1255 (Ind. Ct. App. 2016), *trans. denied*. Rather, the obligations of this rule are enforced first by the individual judge against herself, *id.* (citing *Voss v. State*, 856 Ne.E.2d 1211, 1221 (Ind. 2006); *Tyson v. State*, 622 N.E.2d 457 (Ind. 1993)), and finally by disciplinary actions of our Supreme Court, *id.* (citing Ind. Admission and Discipline Rule 25(VII)). Therefore, we do not independently review a trial judge's recusal decision in light of the CJC Rules, *id.*; nevertheless, in the alternative, or under an

abundance of caution, the *Mathews* court and other panels of this court that have followed the *Mathews* holding have engaged in that independent review anyway, *see Mathews*, 64 N.E.3d at 1256–57; *Abney v. State*, 79 N.E.3d 942, 951–54 (Ind. Ct. App. 2017), *trans. not sought*; *Cheek v. State*, 79 N.E.3d 388, 390–92 (Ind. Ct. App. 2017), *trans. not sought*. Although our Supreme Court has yet to expressly address these holdings from the *Mathews* decision and its progeny, it has not granted relief based solely on the CJC Rules absent an independent procedural vehicle for bringing a recusal claim, *Mathews*, 64 N.E.3d at 1255. Additionally, when reviewing recusal issues, our Supreme Court has used the CJC Rules in analyzing the trial judge's recusal decision, *see L.G.*, 88 N.E.3d at 1071–73;[3] *Lee v. State*, 735 N.E.2d 1169, 1171–72 (Ind. 2000).

[17] Even if we were to undertake an independent review of the PCR judge's decision in light of CJC Rule 2.11(A), Hamilton would not prevail. Because Hamilton's argument regarding CJC Rule 2.11(A) is brought within the context of a Post-Conviction Rule 1(4)(b) motion, we analyze it under the clearly erroneous standard of review set forth above. And, as previously discussed, "[w]e begin with the presumption that a trial judge is unbiased." *State ex rel. Allen v. Carroll Cir. Ct.*, 226 N.E.3d 206, 217 (Ind. 2024) (citing *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002)). "To overcome that presumption, the party

---

[3] In *L.G.*, 88 N.E.3d at 1071–72, our Supreme Court even cited to this court's decisions in *Abney* and *Cheek*; however, it did not repeat, approve, or offer any guidance regarding the proposition in *Mathews* that we should not consider Judicial Conduct Rules as an independent basis of relief for motions requesting recusal or disqualification, *see id.* at 1071–73.

seeking disqualification must *identify facts* reflecting the judge's actual bias or prejudice." *Id.* (emphasis added) (citing *Smith*, 770 N.E.2d at 823).

[18] Our Supreme Court has explained that friendship or professional admiration between a judge and a party or lawyer in a case, without more, may not be enough to require the judge's recusal. *L.G.*, 88 N.E.3d at 1071. Instead, the litigant requesting recusal must show that "an objective person, *knowledgeable of all the circumstances*, would have a rational basis for doubting the judge's impartiality." *Id.* (emphasis added) (citing *Bloomington Mag., Inc. v. Kiang*, 961 N.E.2d 61, 64 (Ind. Ct. App. 2012)). The Court determined that such a rational basis did not exist in *L.G. v. S.L.*, where the trial judge presided over a contested adoption in which the adoptive parents were represented by an attorney who had served as a reference for and had written a recommendation letter on behalf of the trial judge. *Id.* at 1070, 1072–73. There was nothing "unusual" about the attorney's "enthusiastic and flattering" letter nor did the letter "indicate[] any sort of special relationship beyond a professional one." *Id.* at 1073. Ultimately, the Court held the trial court did not abuse its discretion in refusing to recuse in part because "recusal in this instance would not be based on the circumstances of the case, but rather on speculation." *Id.* at 1072–73.

[19] In reaching its conclusion in *L.G.*, the Court also considered Justice Massa's Order in *Indiana Gas Co. v. Indiana Finance Authority*, 992 N.E.2d 678 (Ind. 2013). There, Justice Massa was asked to recuse himself from the case because he had a personal friendship with one of the parties' project managers, as evidenced in part by the project manager's "flattering" speech at Justice

Massa's investiture ceremony. *Id.* at 679–80. Justice Massa declined to recuse himself, reasoning in relevant part as follows:

> It would be disabling to this Court if we were required to recuse every time a 'friend' came before us as a lawyer for a party or worked as an employee of, or consultant to, a party. . . . If mere friendship with these lawyers were enough to trigger disqualification, my colleagues and I would rarely sit as an intact court of five.

*Id.* at 680.

[20] Just as "friendship" or "professional admiration" alone may not be enough to require recusal (although it could be in some instances), neither does employment always demand recusal. *See L.G.*, 88 N.E.3d at 1073. The party requesting recusal must provide more than mere speculation that a judge cannot be unbiased toward a party, witness, or counsel based on the existence of an employment relationship between the judge and person in question. *See id.* at 1072.

[21] At the PCR hearing, Bohdan testified that he has been the magistrate for the Allen Superior Court for three years and is "employed by the three (3) Criminal Division Judges," including the PCR judge. Tr. Vol. II at 7–9. Aside from the Affidavit, this was the only evidence presented to the PCR court regarding the employment relationship between Bohdan and the PCR judge. Bohdan's testimony and the Affidavit demonstrate that Bohdan has an employment relationship with the PCR judge. However, the record is completely devoid of any evidence regarding the "circumstances" of this employment relationship.

For instance, we know nothing about the role the PCR judge played in Bohdan's hiring, how often they work together, how closely they work together, whether the PCR judge reviews the magistrate's work, and how many cases the PCR judge assigns to Bohdan.[4]

[22] Because Hamilton does not provide us any information concerning the circumstances surrounding Bohdan and the PCR judge's employment relationship and instead relies solely on its mere existence, we cannot say Hamilton has overcome the presumption that the PCR judge is impartial such that she clearly erred by denying the Motion based on the requirements of CJC Rule 2.11(A).

### c. *Due Process Clause*

[23] The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. This provision "may sometimes demand recusal even when a judge has no actual bias." *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (alteration and internal quotation marks omitted) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986)). "Recusal is required when, objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be

---

[4] By no means are we suggesting that this is an exhaustive list of factors, that these factors must be considered in a recusal analysis, or that any of these factors are dispositive in such an analysis. Rather, we list these factors as examples of information that we believe might have proven helpful to evaluate whether an objective person would have a rational basis for doubting the PCR judge's impartiality in this case.

constitutionally tolerable.'" *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (citing *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016)). In other words, the court must determine "whether, considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable." *Id.*

[24] The United States Supreme Court has explained that one circumstance in which the risk of bias is constitutionally intolerable is "when the same person serves as both accuser and adjudicator in a case." *Williams*, 579 U.S. at 8. In *Williams v. Pennsylvania*, for example, the prosecutor who sought the death penalty against Williams later became a chief justice and adjudicated William's petition to overturn his death sentence. *Id.* The Court held that the chief justice's failure to recuse himself from Williams's case created an unconstitutional risk of bias because his "authorization to seek the death penalty against Williams amounts to significant, personal involvement in a critical trial decision." *Id.* at 11.

[25] Additionally, in *Bracy v. Gramley*, Bracy filed a habeas petition because the judge who oversaw his murder case was later convicted of accepting bribes from criminal defendants. 520 U.S. 899, 900–02 (1997). Bracy argued that a judge who accepts bribes to rule in favor of some defendants would seek to disguise that favorable treatment by ruling against defendants who did not bribe him, and he sought discovery to support this claim. *Id.* at 902–903. The United States Supreme Court determined Bracy was entitled to discovery "despite the 'speculative' nature of that theory . . . because he had also *alleged specific facts* suggesting that the judge may have colluded with defense counsel to rush the

petitioner's case to trial." *Rippo*, 580 U.S. at 286 (emphasis added) (citing *Bracy*, 520 U.S. at 905–09).

[26] Here, we are not faced with a scenario similar to those in *Williams* and *Bracy*. Instead, the only facts alleged here are that an employment relationship existed between Bohdan and the PCR judge for approximately three years prior to the PCR hearing. Although Hamilton is not required to point to facts suggesting the PCR judge was actually biased against him to demonstrate an unconstitutional risk of bias exists, *see Rippo*, 580 U.S. at 287, simply pointing to the existence of an employment relationship between a witness and a judge is not enough to give rise to a constitutionally intolerable risk of bias. Therefore, the PCR judge's denial of the Motion does not violate the Fourteenth Amendment of the United States Constitution.

## 2. Denial of the PCR Petition

[27] Hamilton contends that the PCR court erred when it denied his PCR petition. As our Supreme Court has explained:

> Post-conviction actions are civil proceedings, meaning the petitioner (the prior criminal defendant) must prove his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). If he fails to meet this burden and receives a denial of post-conviction relief, then he proceeds from a negative judgment and on appeal must prove "that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision." *Wilkes*, 984 N.E.2d at 1240 (quoting *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000)). When reviewing the court's order denying relief, we will "not defer to

the post-conviction court's legal conclusions," and the "findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

*Bobadilla v. State*, 117 N.E.3d 1272, 1279 (Ind. 2019).

[28] In support of his position that the PCR court's denial of his petition was clearly erroneous, Hamilton raises three main issues for our review: (a) whether the PCR court clearly erred when it found Hamilton did not establish that Bohdan provided ineffective assistance of counsel; (b) whether the PCR court clearly erred when it found Hamilton did not establish that Allen provided ineffective assistance of counsel; and (c) whether the PCR court clearly erred when it found that Hamilton is not entitled to a new sentencing hearing based on newly discovered evidence.

### a. *Ineffective Assistance of Trial Counsel*

[29] To evaluate a defendant's ineffective-assistance-of-counsel claim, "we apply the well-established, two-part *Strickland* test."[5] *Bobadilla v. State*, 117 N.E.3d 1272, 1280 (Ind. 2019) (citing *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017)). Under that test, "the defendant must prove: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard

---

[5] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

of reasonableness as gauged by prevailing professional norms; and (2) counsel's deficient performance prejudiced the defendant, i.e., but for counsel's errors the result of the proceeding would have been different." *Id.* (citing *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012)). Failure to satisfy either of the two prongs will cause the claim to fail. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

[30] "There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Counsel is afforded considerable discretion in choosing strategy and tactics and these decisions are entitled to deferential review." *Weisheit v. State*, 109 N.E.3d 978, 983 (Ind. 2018) (internal citations omitted) (citing *Stevens v. State*, 770 N.E.2d 739, 746–47 (Ind. 2002)). Moreover, "isolated mistakes, poor strategy, inexperience and instances of bad judgment do not necessarily render representation ineffective." *Id.* at 984 (citing *Stevens*, 770 N.E.2d at 747). We also consider the "legal precedent available to counsel at the time of his representation of the accused, and counsel will not be deemed ineffective for not anticipating or initiating changes in the law." *Lee v. State*, 91 N.E.3d 978, 987 (Ind. Ct. App. 2017) (quoting *Sweeney v. State*, 886 N.E.2d 1, 8 (Ind. Ct. App. 2008), *trans. denied*) (citing *Smylie v. State*, 823 N.E.2d 679, 690 (Ind. 2005)), *trans. denied*.

[31] Hamilton alleges his trial counsel was ineffective for (i) failing to object to a jury instruction and (ii) failing to conduct a mitigation investigation before sentencing.

### i.  Failure to Object to a Jury Instruction

[32]  Hamilton first claims Bohdan was ineffective because he did not make certain objections to the following final jury instruction (the "Instruction"):

> In Count I, Murder, the formation of the intention to kill may be as instantaneous as successive thoughts.
>
> The intent to kill can be found from the acts, declaration and conduct of the Defendant at or just immediately before the commission of the offense and/or from the nature of the weapon used.

2017 Appellant's App. Vol. II at 61–62.[6]  Hamilton's trial counsel objected to the Instruction as follows:

> MR. BOHDAN:  I would object to State's proposed six as adequately covered by the instructions the Court has already indicated an intention to give.
>
> THE COURT:  I don't think it is covered by the Court's anywhere.  I'll give six over objection . . . .

2017 Tr. Vol. II at 156–57.

[33]  Hamilton argues that Bohdan should have objected to the first half of the Instruction "on the grounds that the language was erroneously taken from a

---

[6] In the Argument section of his brief, Hamilton did not provide Bohdan's verbatim objection to this jury instruction as required by Indiana Appellate Rule 46(A)(8)(e).  However, because Hamilton's noncompliance with Appellate Rule 46(A)(8)(e) does not substantially impede our review of this claim, we choose to address the merits thereof.  *See Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015).

Court of Appeals' sufficiency review, that it unfairly highlighted the State's theory of the case, invaded the province of the jury, and had the potential to mislead and confuse the jury." Appellant's Br. at 50. The PCR court concluded that Bohdan's performance was not deficient on these grounds because "existing authority would not have supported any of the proposed additional grounds for objection . . . , but would (at most) have been potentially useful in arguing for an extension of existing general rules to cover that instruction." Appellant's App. Vol. II at 168.

[34] When a petitioner claims that trial counsel was ineffective because he failed to object at trial, the petitioner "must prove that the trial court would have sustained the objection" to show prejudice under the second prong of the *Strickland* test. *Passwater v. State*, 989 N.E.2d 766, 770 (Ind. 2013) (citing *Lowery v. State*, 640 N.E.2d 1031, 1042 (Ind. 1994)). We recognize that our Supreme Court has warned against using language from appellate cases for jury instructions: "The mere fact that certain language or expression [is] used in the opinions of this Court to reach its final conclusion does not make it proper language for instructions to a jury." *Ludy v. State*, 784 N.E.2d 459, 462 (Ind. 2003) (quoting *Drollinger v, State*, 274 Ind. 5, 25, 408 N.E.2d 1228, 1241 (1980)). A jury instruction that uses language from an appellate case is not improper so long as it is a correct statement of the law and does not mislead the jury. *Keller v. State*, 47 N.E.3d 1205, 1208 (Ind. 2016).

[35] Here, the first half of the Instruction was a correct statement of the law. In *Castellanos v. State*, our Supreme Court reiterated a long-standing concept that

"the formation of the intention to kill and the killing may be as instantaneous as successive thoughts." 477 N.E.2d 279, 281 (Ind. 1985) (citing *Brewer v. State*, 253 Ind. 154, 166, 252 N.E.2d 429, 436 (1969)). Although the *Castellanos* Court made this statement in the context of a now repealed murder statute—Indiana Code section 35-13-4-1 (repealed 1976)—that required the State to prove premeditation, there is no indication that the statement itself is no longer good law. To the extent this statement from the *Castellanos* Court may not be good law, Bohdan cannot "be deemed ineffective for not anticipating or initiating changes in the law." *Lee*, 91 N.E.3d at 987 (quoting *Sweeney*, 886 N.E.2d at 8) (citing *Smylie*, 823 N.E.2d at 690). Furthermore, Hamilton has not pointed us to a single Indiana decision that has found the Instruction or anything similar to it to be error.

[36] Likewise, in *Barany v. State*, the Indiana Supreme Court held that language similar to the second half of the Instruction was a correct statement of law because "[w]e have repeatedly held that the intent to kill may be inferred from the use of a deadly weapon; the nature, duration, or brutality of the attack; and the circumstances surrounding the crime." 658 N.E.2d 60, 65 (Ind. 1995) (citing *Nunn v. State*, 601 N.E.2d 334, 339 (Ind. 1992)). In fact, we recently held in *Birk v. State* that a jury instruction substantially similar to the second half of the Instruction was a correct statement of the law. 215 N.E.3d 1090, 1097–98 (Ind. Ct. App. 2023) (citing *Barany*, 658 N.E.2d at 65), *trans. not sought*.

[37] An instruction misleads the jury when it "unnecessarily emphasize[s] one particular evidentiary fact, witness, or phase of the case." *Ludy*, 784 N.E.2d at

461 (citing *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001)). For instance, in *Ludy v. State*, the trial court gave the following jury instruction: "A conviction may be based solely on the uncorroborated testimony of the alleged victim if such testimony establishes each element of any crime charged beyond a reasonable doubt." 784 N.E.2d at 460. The Indiana Supreme Court determined that this instruction was misleading to the jury because it "unfairly focuse[d] the jury's attention on and highlight[ed] a single witness's testimony"; expressly directed the jury that it could find the defendant guilty without considering all the evidence, which is a "concept used in appellate review that is irrelevant to a jury's function as fact-finder"; and "us[ed] the technical term 'uncorroborated.'" *Id.* at 461–62. Despite the instruction in *Ludy* being erroneous, the error did not require reversal because it "did not affect the defendant's substantial rights." *Id.* at 463.

[38]  Here, by contrast, the Instruction focused on the murder charge, but it did not emphasize particular evidence; it did not invite the jury to consider less than all the evidence; and it did not use technical terms that may confuse a jury. We therefore cannot say that the Instruction was misleading. Because the Instruction was a correct statement of the law and did not mislead the jury, the fact that some of its language came from an appellate case did not render it improper. *See Keller*, 47 N.E.3d at 1208. As such, we cannot say that the trial court would have sustained Hamilton's proffered objections to the Instruction, so the PCR court did not clearly err in finding that Hamilton did not establish

Bohdan provided ineffective assistance of counsel by failing to challenge the Instruction on Hamilton's proffered grounds.

### ii. Failure to Conduct a Mitigation Investigation

[39] Hamilton next challenges the efficacy of Bohdan's assistance during the sentencing phase of trial. Specifically, Hamilton argues that Bohdan provided ineffective assistance of counsel by failing to investigate potential mitigating factors for sentencing, namely Hamilton's mental health issues, including potential bipolar disorder, and traumatic experiences. On this issue, the PCR court concluded only that Hamilton was not prejudiced by Bohdan's failure to present evidence of Hamilton's potential bipolar disorder. Appellant's App. Vol. II at 172–73. The PCR court did not address whether Bohdan provided ineffective assistance of counsel for failing to conduct a mitigation investigation, *see id.*, so we review this issue de novo, *Ellis v. State*, 67 N.E.3d 643, 646 (Ind. 2017) (citing *Allen v. State*, 749 N.E.2d 1158, 1170 (Ind. 2001)).

[40] Hamilton alleged in his amended PCR petition that a reasonable mitigation investigation would have revealed that (1) "Hamilton had a family history of bipolar disorder and severe substance abuse," and (2) Hamilton "experienced two traumatic events as a teenager"—"he had shot himself in the head[,] for which he received no follow-up mental health treatment," and "on a separate occasion, he witnessed his friend shoot himself." Appellant's App. Vol. II at 30. Hamilton also asserted in his amended PCR petition that a psychological evaluation would have revealed that Hamilton "did suffer from the onset of significant mental illness." *Id.*

[41]     Hamilton's presentence investigation report revealed that he had an eleventh-grade education, was in good physical health, and had not been diagnosed with any mental illnesses. Hamilton reported that he was raised by his parents, did not suffer any forms of abuse as a child, had a good childhood, and maintained good relationships with his family. Hamilton became a father at 14 years old. Also according to the presentence investigation report, Hamilton had a history of substance abuse. Since he was 15 years old, Hamilton had used marijuana daily and consumed alcohol once every other month. Hamilton also "used powder cocaine once at age 15, once at 16, and three (3) times at age 17." Ex. Vol. I at 11. Hamilton denied using any other illegal substances. At age 14, Hamilton had an informal juvenile adjustment for battery resulting in bodily injury. At age 17, Hamilton had an informal juvenile adjustment for possession of a controlled substance and possession of marijuana. Hamilton participated in substance abuse treatment as part of both informal adjustments.

[42]     Hamilton's sister Cara Haddix testified at the PCR hearing that they had a significant family history of substance abuse and mental illness. Two of their paternal aunts died of overdoses and a third paternal aunt was hospitalized and diagnosed with bipolar disorder after a suicide attempt. One of Hamilton's sisters struggles with depression and social anxiety, and their paternal grandmother was diagnosed with bipolar disorder. Haddix described their father as being emotionally distant, self-isolating, an alcoholic, subject to mood swings, and rarely in a positive mood. Haddix believed their father's behavior was indicative of bipolar disorder but noted that he did not have a diagnosis.

She also stated that their father was verbally abusive, especially to Hamilton. Haddix further testified that Hamilton's behavior began to resemble their father's as he became a teenager; she noted that he had mood swings, isolated himself, became obsessive, and abused substances. According to Haddix, Hamilton "disengaged" from their family when he used drugs. Tr. Vol. II at 68.

[43] Ashley Kraus, a friend of Hamilton, testified at the PCR hearing that when Hamilton was 16 years old, he shot himself in the head in a single-person game of Russian Roulette. Kraus testified that she watched Hamilton spin the chamber of the revolver, point it at his head, and pull the trigger. The bullet grazed Hamilton's head. He was taken to the hospital via ambulance. Leading up to the Russian Roulette incident, Haddix observed that Hamilton "was much heavier into the drugs. He was more or less just blank. He didn't really care if he lived or died. He was a lot more isolated. The mood swings were so much heavier. He was just overall, it felt, in my opinion, unstable." Tr. Vol. II at 69. Haddix testified that in the wake of the Russian Roulette incident , Hamilton's parents did not seek any mental health help for him.

[44] Hamilton's substance abuse counseling records reveal that Hamilton had "disturbing dreams," Ex. Vol. I at 23; had trouble sleeping; had anxiety, which manifested as agitation and anger; had previously blacked out while angry; experienced panic attacks; had racing thoughts; witnessed a friend shoot himself and was accused by law enforcement of being the shooter; abused substances; had previously been expelled from school; had a family history of

anxiety and depression; and had a family history of drug use leading to health problems.

[45] Assuming for the sake of argument that Bohdan was deficient as Hamilton alleges here, Hamilton has not demonstrated that Bohdan's failure to conduct a reasonable mitigation investigation prejudiced Hamilton. To determine "whether a defendant is prejudiced by counsel's failure at sentencing to present mitigating evidence," courts must determine "what effect the totality of the omitted mitigation evidence would have had on the sentence." *McCarty v. State*, 802 N.E.2d at 968–69 (Ind. Ct. App. 2004) (citing *Coleman v. State*, 741 N.E.2d 697, 702 (Ind. 2000)). Because a trial court's sentencing decision is generally given great deference, *Owen v. State*, 210 N.E.3d 256, 269 (Ind. 2023) (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *as amended* (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)), *reh'g denied* (Aug. 17, 2023), we are "hard pressed to conclude there is a reasonable probability that the trial court would have imposed a lesser sentence had it been presented with additional mitigating evidence that trial counsel should have brought to light," *McCarty*, 802 N.E.2d at 968.

[46] Hamilton argues that if Bohdan had presented evidence concerning his "traumatic experiences" and family history of mental illness and substance abuse, the trial court would have imposed a lesser sentence. We cannot agree. Hamilton's "traumatic experiences" actually demonstrate that Hamilton had a history of reckless and dangerous behavior. By playing with and possessing firearms, Hamilton placed himself in dangerous situations, and associated with

others who engaged in harmful behaviors. Yet Hamilton continued to engage in reckless and dangerous situations, as evidenced by his decisions to participate in robbing Quintana and to ultimately shoot Quintana. *See Hamilton*, No. 02-A03-1704-CR-932, slip op. at ¶¶ 3–5. Moreover, the evidence of Hamilton's family history of mental illness and substance abuse would have only served to potentially impeach Hamilton's presentence investigation report in which he reported that he had not been diagnosed with any mental illnesses, did not suffer any forms of abuse as a child, had a good childhood, and maintained good relationships with his family. The same is true of the substance abuse counseling records and Haddix's testimony. We do not believe the trial court would have sentenced Hamilton any differently on these facts if the trial court had learned that Hamilton's family members had suffered from either alcohol or drug abuse, or mental illnesses.

[47] We also do not believe the trial court would have determined that Hamilton's struggles with anxiety, racing thoughts, and insomnia had much, if any, mitigating value. To determine the weight a defendant's mental illness should be given at sentencing, the court considers several factors, including "(1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment; (2) overall limitations on functioning; (3) the duration of the mental illness; and (4) the extent of any nexus between the disorder or impairment and the commission of the crime." *Conley v. State*, 972 N.E.2d 864, 874 (Ind. 2012) (quoting *Krempetz v. State*, 872 N.E.2d 605, 615 (Ind. 2007)). There is no evidence in the record that Hamilton's anxiety, racing thoughts, or

insomnia impaired his ability to control his behavior, limited his functioning, or was in any way linked to the offense.

[48] Hamilton's alleged omitted mitigation evidence has weak mitigating value at best and at worst actually has aggravating value. Additionally, Bohdan did present several mitigating circumstances for the court to consider and balance against the aggravating circumstances. On this record, we cannot say that the trial court would have imposed a mitigated sentence but for Bohdan's alleged failure to conduct a reasonable mitigation investigation and resulting failure to present evidence of Hamilton's "traumatic experiences" and family history of mental illness and substance abuse. Therefore, the trial court did not err when it found Hamilton did not prove Bohdan provided ineffective assistance of counsel.

### b. *Ineffective Assistance of Appellate Counsel*

[49] We also use the *Strickland* test to evaluate Hamilton's claim that he received ineffective assistance of appellate counsel. *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007) (citing *Taylor v. State*, 717 N.E.2d 90, 94 (Ind. 1999)). Ineffective assistance of appellate counsel claims fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013). Hamilton specifically claims that his appellate counsel was ineffective because he failed to present two issues on appeal: (i) whether the trial court used improper aggravating factors in sentencing Hamilton and (ii) whether Hamilton's sentence was inappropriate under Appellate Rule 7(B).

[50] "To show that counsel was ineffective for failing to raise an issue on appeal, the petitioner must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential." *Reed v. State*, 856 N.E.2d 1189, 1195 (Ind. 2006) (citing *Ben-Yisrayl*, 738 N.E.2d at 261). To evaluate the performance prong when appellate counsel failed to raise an issue on appeal, we apply the following test: (1) whether the unraised issue is significant and obvious from the face of the record, and (2) whether the unraised issue is "clearly stronger" than the raised issues. *Id.* (citing *Timberlake v. State*, 753 N.E.2d 591, 605–06 (Ind. 2001)). To determine if the defendant was prejudiced, we examine whether "the issues which . . . appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." *Id.* (alteration in original) (quoting *Bieghler v. State*, 690 N.E.2d 188, 194 (Ind. 1997)). "Ineffective assistance of counsel is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal" because "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Id.* at 1196 (citing *Bieghler*, 690 N.E.2d at 193).

[51] We initially observe that on appeal, Allen did not challenge Hamilton's sentence directly; rather, Allen focused on Double Jeopardy and bifurcation issues. *Hamilton*, No. 02A03-1704-CR-932, slip op. at ¶ 1.

### i. Failure to Appeal the Trial Court's Alleged Use of Improper Aggravator

[52]  Hamilton first contends that Allen should have challenged his sentence based on the trial court's use of Hamilton's informal juvenile adjustments as an aggravating factor. Hamilton does not argue that Allen should have challenged his sentence based on the trial court's use of the nature and circumstances of Hamilton's offense as the only other aggravating factor.

[53]  It is "completely appropriate for the trial court to consider [a defendant's] criminal history as an aggravating factor." *McElfresh v. State*, 51 N.E.3d 103, 111–12 (Ind. 2016). Indiana Code section 35-38-1-7.1(a)(2) specifically states that when imposing a sentence, the court may consider as an aggravating circumstance the defendant's "history of criminal or delinquent behavior." The weight of the criminal history may vary "based on the gravity, nature[,] and number of prior offenses as they relate to the current offense," *id.* at 112 (quoting *Williams v. State*, 838 N.E.2d 1019, 1021 (Ind. 2005)), but consideration of such criminal history is not an abuse of discretion, *id.* Accordingly, it was not erroneous for the trial court here to consider Hamilton's informal juvenile adjustments as an aggravating factor.

[54]  In addition, on direct appeal, we would have reviewed the trial court's sentencing decision for only an abuse of discretion. *See Owen*, 210 N.E.3d at 269 (quoting *Anglemyer*, 868 N.E.2d at 490). Even if Allen had challenged only the trial court's use of Hamilton's informal juvenile adjustments as an aggravating factor (as Hamilton argues Allen should have), we would not have

remanded for resentencing so long as we could have said "with confidence the trial court would have imposed the same sentence had it not considered the purportedly erroneous aggravators," *Owen*, 210 N.E.3d at 269 (citing *McDonald v. State*, 868 N.E.2d 1111, 1114 (Ind. 2007)).

[55]   Hamilton asserts that the trial court's statement regarding the nature and circumstances of the offenses is insufficient to support his sentence. At the sentencing hearing, the trial court stated that it found "the nature and circumstances of the crimes to be aggravators, again all as reflected in the Affidavit for Probable Cause and in the information presented to the jury and as argued by the State of Indiana." Sent. Tr. Vol. I at 15. Hamilton argues that this statement is similar to the inadequate statement in *Wooley v. State*, 716 N.E.2d 919, 929–30 (Ind. 1999).[7] We disagree.

[56]   In *Wooley*, the trial court found as an aggravating factoring that "the defendant is in need of correctional or rehabilitative treatment that can best be provided by commitment of defendant to a penal facility." 716 N.E.2d at 929–930 (citing I.C. § 35-38-1-7.1(b)(3)). The trial court explained that "the defendant has not voluntarily attempted any rehabilitative treatment such as counseling while incarcerated." *Id.* at 930. Our Supreme Court concluded that the trial court's

---

[7] We observe that *Wooley* was decided under the now-repealed presumptive sentencing scheme. However, the discussion in *Wooley* regarding the need for trial courts to sufficiently explain aggravating factors still applies.

"statement is insufficient to support the imposition of an aggravated sentence" because

> [e]very executed sentence entails incarceration. The question is whether extended incarceration is appropriate. There is no evidence to support the conclusion that Wooley is in need of treatment beyond the presumptive term. . . . The trial court did not provide a specific or individualized statement of reason why Wooley was in need of time in a penal institution in excess of the presumptive sentence.

*Id.*

[57] Here, however, the trial court expressly referenced the Affidavit of Probable cause, informations, and the State's sentencing argument. According to those documents, Hamilton and Yancey planned to rob Quintana because Quintana allegedly shorted Yancey $10-worth of marijuana in a prior drug deal. When Quintana attempted to foil their robbery attempt, Hamilton shot Quintana in the back. Hamilton and Yancey then fled the scene and did not attempt to get help for Quintana. Again, the trial court did not impose an aggravated sentence; instead, the trial court imposed only an advisory sentence on the first two counts and a lower mid-range sentence for the enhancement due to the use of a firearm.

[58] Hamilton also asserts that the trial court should not have considered his informal juvenile adjustments to be aggravating because they were not relevant to his convictions for murder and robbery or to the firearm enhancement. Hamilton primarily relies on our Supreme Court's decision in *Brown v. State* to

support this argument, but that case is inapposite on this particular issue because it addresses only revision of the defendant's sentence under Appellate Rule 7(B); it does not address whether the defendant's "lengthy history of juvenile adjustments" was an improper aggravating factor. *Brown v. State*, 10 N.E3d 1, 5–6 (Ind. 2014). Further, to the extent Hamilton's argument is an invitation for us to reweigh the evidence, we decline as that is something we could not have done on direct appeal. *See McElfresh*, 51 N.E.3d at 108.

[59] We believe that the trial court's sentencing statement is sufficient and that Hamilton has not demonstrated that the trial court would have imposed a lesser sentence if it had not considered Hamilton's informal juvenile adjustments. Consequently, even if Allen had challenged the trial court's use of Hamilton's informal juvenile adjustments as an aggravating factor, it was not "clearly more likely to result in reversal or an order for a new trial." *Reed*, 856 N.E.2d at 1195. Based on the foregoing, we cannot say that the trial court clearly erred in finding that Hamilton did not establish Allen provided ineffective assistance of counsel by failing to raise this issue on appeal.

### ii.    Failure to Appeal Hamilton's Sentence Pursuant to Appellate Rule 7(B)

[60] Hamilton next argues that Allen should have challenged his sentence under Appellate Rule 7(B). The Indiana Constitution authorizes us to independently review and revise a trial court's sentencing decision. *Faith v. State*, 131 N.E.3d 158, 159 (Ind. 2019) (citing Ind. Const. art. 7, §§ 4, 6; *McCain v. State*, 88 N.E.3d 1066, 1067 (Ind. 2018)). That authority is implemented through

Appellate Rule 7(B), which permits us to revise a sentence if, after due consideration of the trial court's decision, we find that the sentence is "inappropriate in light of the nature of the offense and the character of the offender." *Faith*, 131 N.E.3d at 159 (quoting App. R. 7(B)).

[61] Our role under Appellate Rule 7(B) is to "leaven the outliers," *Faith*, 131 N.E.3d at 159–60 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)), and we reserve that authority for exceptional cases, *id.* at 160 (citing *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017), *reh'g denied*). When gauging inappropriateness under Appellate Rule 7(B), we "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Brown*, 10 N.E.3d at 8 (citing *Cardwell*, 895 N.E.2d at 1225). Generally, a trial court's sentencing decision prevails unless it is "overcome by compelling evidence portraying in a positive light the nature of the offense . . . and the defendant's character." *Stephenson v. State*, 29 N.E.3d 111, 111–12 (Ind. 2015). In conducting this analysis, "we are not limited to the mitigators and aggravators found by the trial court." *Brown*, 10 N.E.3d at 4. Importantly for our purposes here, our Supreme Court "has not been hesitant to reduce maximum sentences for juveniles convicted of murder." *Id.* at 7.

[62] When considering the nature of the offense, we start with the advisory sentence. *Brown*, 10 N.E.3d at 4 (citing *Anglemyer*, 868 N.E.2d at 494). Here, the trial court sentenced Hamilton on his convictions for (1) murder, (2) robbery as a Level 3 felony, and (3) an enhancement for use of a firearm. First, a "person

who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, *with the advisory sentence being fifty-five (55) years.*" I.C. § 35-50-2-3(a) (emphasis added). Second, a "person who commits a Level 3 felony . . . shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, *with the advisory sentence being nine (9) years.*" *Id.* § 35-50-2-5(b) (emphasis added). Finally,

> [i]f the jury . . . finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally used a firearm in the commission of the offense . . . , the court may sentence the person to an additional fixed term of imprisonment of between five (5) years and twenty (20) years.

*Id.* § 35-50-2-11(g).

[63] The trial court sentenced Hamilton to an advisory sentence for both convictions. **(Sent. Tr. Vol. I at 15.)** The trial court enhanced Hamilton's sentence by 10 years for his use of a firearm. **(*Id.*)** The trial court ordered the sentences to be served consecutively and executed at the Department of Correction, resulting in a total sentence of 74 years at the Department of Correction. **(*Id.*)** Hamilton argues that his aggregate sentence is an outlier when compared to other juveniles convicted of murder who have had their sentences reduced by the Indiana Supreme Court.

[64] For instance, in *Brown v. State*, 16-year-old Brown was convicted of two counts of murder and one count of robbery, and the trial court imposed the maximum sentence of 65 years for both murder counts and the maximum sentence of 20

years for the robbery count, all to be served consecutively, for a total aggregate sentence of 150 years. 10 N.E.3d at 3. Our Supreme Court reduced this sentence to "an enhanced sentence" of 60 years for both murder counts, to be served concurrently, and "an enhanced sentence" of 20 years for robbery to be served consecutively, for a total aggregate sentence of 80 years imprisonment. 10 N.E.3d at 8. Likewise, in *Fuller v. State*, concerning the same robbery and murders as in *Brown*, our Supreme Court reduced 15-year-old Fuller's 150-year aggregate sentence to a total aggregate sentence of 85 years imprisonment. 9 N.E.3d 653, 658–59 (Ind. 2014). Our Supreme Court reduced Brown's and Fuller's sentences in part because their 150-year sentences "forsw[ore] altogether the rehabilitative ideal." *Brown*, 10 N.E.3d at 8 (quoting *Miller*, 567 U.S. 472); *Fuller*, 9 N.E.3d at 658 (quoting *Miller*, 567 U.S. 472).

[65]   Hamilton also points to several cases our Supreme Court decided in the 1990s. First, in *Carter v. State*, 711 N.E.2d 835 (Ind. 1999), our Supreme Court reduced 14-year-old Carter's 60-year sentence to 50 years for "the brutal murder of a seven-year-old girl." *Brown*, 10 N.E.3d at 7 (citing *Carter*, 711 N.E.2d at 836–37). Likewise, in *Walton v. State*, our Supreme Court reduced 16-year-old Walton's 120-year sentence to 80 years for brutally beating his adoptive parents to death while they slept, to which he pled guilty but mentally ill. 650 N.E.2d 1134, 1135, 1137 (Ind. 1995). In *Widener v. State*, our Supreme Court reduced 17-year-old Widener's 70-year sentence to 50 years for conspiracy to commit robbery and felony murder, to which he pled guilty. 659 N.E.2d 529, 530–31, 534 (Ind. 1995).

[66]     The defendants in *Brown*, *Fuller*, *Carter*, *Walton*, and *Widener* did not have their sentences enhanced for using a firearm during the commission of their offenses. *Brown*, 10 N.E.3d at 3; *Fuller*, 9 N.E.3d at 656; *Carter*, 711 N.E.2d at 836–37; *Walton*, 650 N.E.2d at 1135; *Widener*, 659 N.E.2d at 530.  Further, they all received maximum aggregate sentences.  *Brown*, 10 N.E.3d at 3; *Fuller*, 9 N.E.3d at 656; *Carter*, 711 N.E.2d at 836–37; *Walton*, 650 N.E.2d at 1135; *Widener*, 659 N.E.2d at 530.  Here, by contrast, Hamilton was found to have used a firearm during the offense, which resulted in an enhanced sentence,[8] and he did not receive a maximum sentence for any of his offenses; rather, he received only the advisory sentences for his murder and robbery convictions, and he received a lower-midrange sentence for the firearm enhancement.

[67]     Hamilton next contends that his sentence is an outlier based on credit time. "[E]valuation of a defendant's sentence may include consideration of the defendant's credit time status because this penal consequence was within the contemplation of the trial court when it was determining the defendant's sentence."  *Sharp v. State*, 970 N.E.2d 647, 651 (Ind. 2012).  Hamilton primarily points to the fact that when Brown and Fuller were originally sentenced, they

---

[8] Hamilton asserts, without support, that the State did not pursue use of a firearm enhancements for Brown and Fuller despite their eligibility therefor.  Appellant's Br. at 33; *see* App. R. 46(A)(8)(a) ("Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.").  Prosecutors have broad discretionary power to choose the persons whom they prosecute, *Cain v. State*, 955 N.E.2d 714, 718 (Ind. 2011) (citing *Corcoran v. State*, 739 N.E.2d 649 (Ind. 2000)), and the charges to bring against those persons, *Artigas v. State*, 122 N.E.3d 1003, 1006 n.5 (Ind. Ct. App. 2019) (citing *Hendrix v. State*, 759 N.E.2d 1045, 1047 (Ind. 2001)).  We do not substitute our discretion for that of the prosecuting attorney on such matters.  *Johnson v. State*, 675 N.E.2d 678, 683 (Ind. 1996).

were entitled to Class I credit time, which is "one (1) day of credit time for each day the person is imprisoned for a crime or confined awaiting trial or sentencing." I.C. § 35-50-6-3(b) (2012); *see id.* § 35-50-6-4(a) (2012); *see also id.* § 35-50-6-3(c). Thus, after deducting earned good time credit, Brown will actually serve approximately 40 years and Fuller will actually serve approximately 42.5 years. *See Brown*, 10 N.E.3d at 8; *Fuller*, 9 N.E.3d at 658–59; I.C. §§ 35-50-6-3(b), -4(a) (2012).

[68] However, in 2014, after Brown and Fuller were sentenced but before Hamilton committed the instant offense, the Indiana General Assembly revised the criminal code to increase the actual time served for the most serious offenses. *Compare* I.C. § 35-50-6-3, *with* I.C. § 35-50-6-3.1. With Class B credit time, which is one day of credit time for every three days served, I.C. § 35-50-6-3.1(b), Hamilton will actually serve approximately 55 years.[9] Although Hamilton received a total aggregate sentence that is less than Brown's and Fuller's total aggregate sentences, Hamilton's actual sentence is greater than Brown's and Fuller's actual sentences. Our legislature intended such a result when it modified Indiana's credit time scheme. *Erkins v. State*, 13 N.E.3d 400 (Ind. 2014) (quoting *Hendrix v. State*, 759 N.E.2d 1045 (Ind. 2001)) ("The best evidence of legislative intent is the language of the statute itself . . . ."); *compare*

---

[9] Hamilton may actually serve less than 55 years if he earns educational credit pursuant to Indiana Code section 35-50-6-3.3. In fact, Dr. Burnett testified that Hamilton has earned his G.E.D. and participated in reformative programs since being incarcerated, which will likely result in Hamilton earning educational credit, I.C. § 35-50-6-3.3(a)(3)(A), (b)(3)(D), (d)(1), (d)(8), thereby reducing the amount of time he actually serves.

I.C. § 35-50-6-3, *with* I.C. § 35-50-6-3.1. Due to Hamilton's additional enhancement for use of a firearm and the change in credit time, Hamilton's comparison of his actual sentence to that of Brown's and Fuller's is unavailing.

[69] Based on the record available to Allen for Hamilton's direct appeal, Hamilton did not show that it was significant and obvious from the face of that record that his advisory sentence is an outlier among the sentences of other juveniles convicted of murder, robbery, or both, especially in light of his use of a firearm enhancement. Similarly, based on the record available to Allen for Hamilton's direct appeal, Hamilton did not show that asking an appellate court to revise his advisory sentence pursuant to Appellate Rule 7(B) was "clearly more likely to result in reversal or an order for a new trial." *Reed*, 856 N.E.2d at 1195. As such, we cannot say that the trial court clearly erred in finding that Hamilton failed to establish that Allen provided ineffective assistance of counsel on this ground.

### c. *Newly Discovered Evidence*

[70] Hamilton contends that he is entitled to a new sentencing hearing on the basis that there is newly discovered evidence concerning his mental health. Post-Conviction Rule 1(1)(a)(4) states in relevant part that a "person who has been convicted of, or sentenced for, a crime by a court of this state" may file a PCR petition based on the alleged existence "of material facts, not previously presented and heard, that requires vacation of the . . . sentence in the interest of justice." New evidence mandates a new sentencing hearing only when the petitioner demonstrates the following:

(1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial.

*Kubsch v. State*, 934 N.E.2d 1138, 1145 (Ind. 2010) (quoting *Taylor v. State*, 840 N.E.2d 324, 329–30 (Ind. 2006)). We analyze "these nine factors with care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Id.* (quoting *Taylor*, 840 N.E.2d at 330).

[71] Hamilton specifically contends that his bipolar disorder diagnosis "is newly discovered evidence that should be considered when fashioning a sentence." Appellant's Br. at 47. Assuming for the sake of argument that Hamilton can establish that evidence of his bipolar disorder diagnosis can satisfy the first eight factors described above, he has not established that such evidence can satisfy the ninth factor. Whereas Dr. Burnett believed within a reasonable degree of medical certainty that Hamilton was suffering from bipolar disorder at the time of the offense, as discussed above, Dr. Burnett also testified that Hamilton's behavior leading up to the robbery and murder "could be construed to both a bipolar episode and/or to youthfulness and/or to substance abuse and/or to trauma-related effects." Tr. Vol. II at 112. Furthermore, Dr. Burnett stated in his report that Hamilton's scores on the MMPI-2 and TSI-2 indicated he was exaggerating his symptoms. Because of the minimal value of Dr. Burnett's

testimony, evidence of this diagnosis is unlikely to produce a different result at resentencing. Accordingly, the PCR court did not clearly err in finding that evidence of Hamilton's bipolar disorder diagnosis was not newly discovered warranting a new sentencing hearing.

## Conclusion

[72] In sum, the PCR court did not err by denying the Motion and did not err by denying Hamilton's PCR claims of ineffective assistance of trial counsel, ineffective assistance of appellate counsel, and newly discovered evidence. We therefore affirm the PCR court's decisions on all issues raised.

[73] Affirmed.

Crone, J., concurs in part and concurs in result in part with separate opinion.
Brown, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

**Crone, Judge, concurring in part and concurring in result in part.**

[74] I fully concur in the lead opinion's resolution of issue 2. Regarding issue 1, however, I believe that Post-Conviction Rule 1(4)(b) controls here and thus it is inappropriate to undertake an independent review of the PCR judge's decision to deny Hamilton's motion for change of judge under CJC Rule 2.11(A). As the *Mathews* court persuasively reasoned with respect to former Indiana Criminal Rule 12(B),[1] allowing CJC Rule 2.11(A) to serve as "a freestanding mechanism for relief" would "effectively nullify" Post-Conviction Rule 1(4)(b) and "usurp the exclusive supervisory authority of our supreme court over judicial conduct." 64 N.E.3d at 1254, 1255. Post-Conviction Rule 1(4)(b) and CJC Rule 2.11(A) might encompass some of the same considerations regarding judicial bias, but the standards for evaluating bias under those rules are different, and we should refrain from stepping into the shoes of our supreme court. Accordingly, I concur only in result as to issue 1.

---

[1] Former Criminal Rule 12(B) is substantially similar to Post-Conviction Rule 1(4)(b). Effective January 1, 2024, Criminal Rule 12(B) was amended and renumbered as Criminal Rule 2.4(B).

**Brown, Judge, dissenting.**

I respectfully dissent from the majority's decision that the post-conviction court did not err in denying Hamilton's motion for change of judge. "The public entrusts the judiciary 'to provide a tribunal as superior to influence as possible, in which [a] claim might be decided.'" *Matter of Guardianship of Garrard*, 624 N.E.2d 68, 70 (Ind. Ct. App. 1993) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 382, (1821) (Marshall, C.J.)). "In order to have faith that our judicial system operates providently, the public must have confidence in the procedure by which our courts render decisions." *Id. See also* Ind. Code of Judicial Conduct Rule 2.11 ("A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality[] might reasonably be questioned . . . ."); Ind. Code of Judicial Conduct Rule 2.11 cmt. 8(1) ("Because of the important nature of maintaining confidence in the judiciary, a judge should, even over the agreement of the parties, disqualify himself/herself in any situation when reasonable minds with knowledge of all the relevant circumstances disclosed by a reasonable inquiry would conclude that the judge's integrity, impartiality, or independence to serve as a judge is impaired.").

Hamilton alleged that he received ineffective assistance of trial counsel from Bohdan based upon multiple allegations. In his affidavit attached to his Verified Motion for Change of Judge, Hamilton asserted that he was charged with multiple offenses, including murder, in cause number 02D06-1608-MR-5,

Bohdan represented him at trial, and he believed Bohdan was an Allen County magistrate working for Judge Gull who presided over his case and sentencing.

[77] At the December 10, 2021 post-conviction hearing at which Judge Gull presided, Bohdan testified that he was employed as a magistrate in the Allen Superior Court, which was the same court that was holding the post-conviction hearing. He also indicated Judge Gull employed him.

[78] In light of Bohdan's representation of Hamilton at trial, the multiple allegations of ineffective assistance asserted against Bohdan, and the relationship between Bohdan as a current magistrate employed by the post-conviction judge, I conclude that the facts recited in the affidavit support a rational inference of bias or prejudice. While I express no opinion on the issues of ineffective assistance of both trial and appellate counsel, I note that these claims as argued by Hamilton appear to present close determinations, and I would find that the appearance of impropriety requires reversal.

[79] For the foregoing reasons, I would find the post-conviction court erred in denying Hamilton's motion for change of judge and would reverse and remand for the issues to be decided by a new judge.